## THORNTON *v.* THE STATE.

1. On the trial of a defendant for the murder of his wife, his declaration to another, that "he had tried to care for his wife but that she had forced him to do what he had done," is not admissible in evidence in his behalf, though made in a half-minute after the commission of the crime, it appearing that this statement was made to one in the house of defendant, where he had gone after he had left the scene of the killing, and the circumstances not indicating that the statement was free from suspicion of afterthought.

2. The fact that the solicitor-general, in his concluding argument to the jury, read from a transcript made by the stenographer from his notes of the evidence and commented thereon, is not ground for a new trial, when it does not appear from the motion what were the contents of the transcript, nor that anything was read or said by the solicitor different from what was actually testified to on the trial.

3. When the character of the deceased for violence had been put in issue before the jury, it was proper for the court to instruct the jury that general character of the deceased in this particular could not be proved by specific acts of violence.

4. It was not error for the court to charge the jury that " when the guilt of the

accused is made to appear by proof to the satisfaction of the jury beyond a reasonable doubt, the jury are authorized to convict regardless of the good character of the accused''; the court having also charged in the same connection that "the jury has the right to consider the good character of the accused, not merely where his guilt is doubtful under the other testimony in the case, but where such testimony of good character may of itself generate such doubt."

5. Under the facts in this case, there was no error in charging the jury to the effect that a felonious attack upon another with brickbats and rocks, by virtue of which the party assailed is knocked into a ditch or by virtue of which she falls into a ditch in an effort to escape from the blows of the assailant, would be murder, if such attack was the primary cause of the death of the party assailed, although the death may have resulted from the fall.

6. Under the evidence in this case, there was no reasonable theory upon which the defendant could have based his contention that, if he was guilty of any crime at all, it was involuntary manslaughter. Even if such theory could have been predicated upon the statement of the defendant, there was no error in omitting to charge the jury what would be the form of their verdict in the event they found the defendant guilty of involuntary manslaughter, no request to charge on this subject having been made by defendant's counsel.

7. There was sufficient evidence to sustain the verdict of guilty.

Argued March 20, — Decided April 18, 1899.

Indictment for murder. Before Judge Littlejohn. Sumter superior court. November term, 1898.

*H. B. Simmons, J. N. Scarborough* and *Allen Fort*, for plaintiff in error. *J. M. Terrell, attorney-general*, and *F. A. Hooper, solicitor-general*, contra.

LEWIS, J. Will Thornton was found guilty under an indictment in Sumter superior court, charging him with the offense of the murder of his wife. The testimony develops the following case made out by the State's witnesses: In the month of July, 1898, the attention of witnesses was first attracted to a difficulty between the defendant and his wife, by hearing screams and cries for help in their house. He was at the time violently engaged in beating her. She started to run from the house, and as she got to the door a severe wound was observed on her head. The defendant then struck her with a rock and knocked her to the ground. She arose, still endeavoring to escape from him, and finally a man came to her rescue, and while she had hold of him and he was trying to protect her, the

defendant threw another rock or brickbat and knocked his wife away from her would-be protector to the ground; she arose, again made an effort to escape, and had reached the top of the steps that led down to the street several feet below, when another rock or brickbat was hurled against her head by her husband, knocking her into a ditch or ravine, where she remained still, as if dead. The defendant then went to the edge of the bluff, looked down upon the body of his wife, threw another missile at her, and afterwards left the scene and returned to his house. During the time of the assault, cries of help and murder, and repeated pleas for her life, were made by the wife. The wounds upon her head were severe and extensive, but the probabilty is, from the testimony, that her death was really caused by the fall, which seems to have broken her neck. The defendant introduced several witnesses, none of whom contradicted the above facts. He showed by them his good and peaceable character, and also the violent and quarrelsome disposition of his wife. In his statement he related facts concerning the violent conduct of his wife and her aggravating demeanor towards him for a long time previous to the homicide. He claimed that he was not mad with his wife at the time she was killed; that he was not throwing at her when she fell in the ravine, but at the man who was interfering with them, and that the movement of this person caused the fall of his wife. The jury returned a verdict of guilty; whereupon the defendant moved for a new trial, and excepts to the judgment of the court overruling the motion.

1. The defendant's counsel offered to prove by a witness upon the stand that after the defendant had returned from the scene of the killing to his house, he stated to this witness, who was then in the house, that "he had tried to care for his wife, but that she had forced him to do what he had done"; and he further offered to show that this statement was made in about a half a minute after the killing. On objection of State's counsel to this testimony, it was excluded from the jury. It is insisted by counsel for plaintiff in error that the declaration was so nearly connected with the criminal act charged as to constitute a part of the res gestæ. Section 998 of the Penal

Code provides that "Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, are admissible in evidence as part of res gestæ." While time is an important element to consider in determining what sayings constitute part of the res gestæ of any transaction, yet it is by no means the only thing to be considered. As McCay, Judge, said in the case of *Hall* v. *State*, 48 *Ga.* 608, "The res gestæ of a transaction is what is done during the progress of it, or so nearly upon the actual occurrence as fairly to be treated as cotemporaneous with it. No precise point of time can be fixed a priori when the res gestæ ends. Each case turns on its own circumstances. Indeed, the inquiry is rather into events than into the precise time which has elapsed. Is the proof offered of a matter fairly a part of the same transaction? Is it an event happening naturally and spontaneously as a part of the occurrence under investigation?" Measured by this rule, which is manifestly a fair and proper one, we do not think the court erred in rejecting this testimony under the facts of this case. The defendant, after inflicting the fatal blow, walked to the brink overlooking the dead body of his wife, for a moment looked down upon her lifeless form, hurled another stone at her, then turned, went to his house which was a few steps off, and to a witness in that house made the statement which is claimed to be a part of or contemporaneous with the particular act under investigation. As Chief Justice Bleckley says in the case of *Travelers Ins. Co.* v. *Sheppard*, 85 *Ga.* 775, "What the law altogether distrusts is not after-speech, but afterthought." When one sees the horrible results of his criminal act and turns from the scene of his crime, this "afterthought" of the necessity of saying something in extenuation of his conduct may come in a moment; yea, with the rapidity of a flash of lightning. We think it would be carrying the doctrine of res gestæ entirely too far to contend that this defendant, as he turned from the sight of the horrors of his bloody act, did not, during his walk back to the house, brief though it was, have opportunity to reflect upon what he should say or what excuse he should render for such a murderous assault upon his

wife.. In the case of *Futch* v. *State*, 90 *Ga.* 478, the declara-
tions of a witness, made in a similarly short time after she had
appeared running into the house from the scene of the shoot-
ing, were held inadmissible. While the space of time inter-
vening between the transaction and the declarations was not
more than a minute, yet the court attached more importance
to the manner in which the declaration was made, namely,
in a whisper. But apart from the question as to whether the
declaration of the defendant in this case was free from suspi-
cion of afterthought, we can not see what advantage it could
possibly have been to him, even had it gone to the jury. In
the first place, he does not say how his wife "had forced him
to do what he had done"; and besides, it was an implied ad-
mission that he had killed his wife, which was in direct con-
tradiction to his statement. We are inclined to think the
State could have made the proof by offering the testimony as
a quasi-confession, or a contradiction of the defendant's state-
ment.

2. Another ground in the motion for a new trial is, that the
solicitor-general in conclusion was allowed to read to the jury
a transcript made by the stenographer from his notes of the
evidence, and make therefrom a statement as to what a certain
witness testified. It does not appear from the record that
what the solicitor read and said was at all different from what
had actually been testified to from the stand. Manifestly,
then, it does not appear that any harm was done the accused
by the court's permitting the State's officer in his final argu-
ment to use the manuscript and make the statement which
was objected to.

3. Exception is taken in the motion for a new trial to the
court's charging, "that the character of the deceased for
violence could not be established by specific acts of violence."
This is not an open question before this court. The principle
has been repeatedly recognized as good law in previous de-
cisions. See *Keenan* v. *State*, 18 *Ga.* 194; *Pound* v. *State*, 43
*Ga.* 128; *Doyal* v. *State*, 70 *Ga.* 147.

4. Good character of one on trial for the commission of a
crime is always admissible in evidence in his favor. It is a

substantive, independent fact which the jury should always consider when proved, in connection with all the other testimony in the case, in determining the guilt or innocence of the accused. To say that a conviction could be had if the jury were satisfied from other testimony in the case of the defendant's guilt would be to give the fact of good character no weight at all. To say on the other hand that a conviction can not be had when good character is established would be equally as absurd. This court has accordingly repeatedly held, that while a defendant may be legally convicted notwithstanding the establishment of his good character by proof, yet the jury should consider such character, not merely where his guilt is doubtful under the other testimony, but where such testimony of character may itself generate such doubt. The charge of the court complained of, embodied in the fourth headnote of this decision, is entirely in accord with this principle. *Shropshire* v. *State*, 81 *Ga.* 589; *Hathcock* v. *State*, 88 *Ga.* 92.

5. Error is alleged in the following charge of the court: "In the indictment, gentlemen, the State charges that the killing was done by a blow on the head with a brickbat or a rock, and by knocking the deceased in a ditch. Now, if you believe from the evidence that the defendant made a felonious attack on the deceased, and with a brickbat or rock knocked the deceased into a ditch and that she broke her neck, or if you believe from the evidence that the defendant made such felonious and unlawful attack on the deceased, and in an effort to escape such felonious and unlawful attack she fell into a ditch and broke her neck, still if the felonious attack was the primary cause of her death, the defendant would still be guilty." It will be presumed that the jury thoroughly understood, under the other instructions of the court, what was meant by the term "felonious attack"; that it was an effort by the accused to perpetrate a felony upon the deceased. It is a too well established principle of law to require any discussion whatever, that when such an assault is made, especially under such circumstances as to endanger human life, it is murder should it result as a primary cause in the death of the assailed.

6. Exception is taken to the failure of the court to charge the jury as to what would be the form of their verdict in case they found the defendant guilty of involuntary manslaughter. Under the evidence in this record we can see in it no element of involuntary manslaughter. It was earnestly insisted by counsel for plaintiff in error that there was no proof that the missiles used by the defendant were weapons likely to produce death. It is true no witness testified that in his opinion the instruments used by the assailant were of such a character as to have this tendency and effect. Had there been such evidence it would have amounted to nothing more than an opinion of a witness, from which the jury might have disagreed and formed an independent opinion of their own. When the facts are given from the stand, the jury can form their own opinion from them, without receiving the aid of an opinion from others. The proximity of the parties, the wounds made by the blows, the effect of these blows in felling repeatedly to the earth the assailed, the persistent attack, followed up with rocks and brickbats while the victim was fleeing and pleading for her life, and all the circumstances of this case, were certainly sufficient to authorize the inference that there was an intention to kill; and the attacks having resulted in the death of the deceased we think excludes every idea of the absence of such intention. The only theory upon which we see that the defendant can possibly claim that he was entitled to a charge upon the subject of involuntary manslaughter is based upon his statement of an absence of any intention whatever to inflict the blow that resulted in the death of the deceased. This is absolutely uncorroborated by any evidence in the case. In the case of *Brown* v. *State,* 28 *Ga.* 200 (8), it is decided: "If there be nothing in the evidence to call for a charge of the court on the law of involuntary manslaughter, it is not error in the court to fail to give it." In *O'Shields* v. *State,* 55 *Ga.* 697, it is ruled that, "When the facts proven, in any view which can be taken of them, can not make a case of involuntary manslaughter, it is not error to decline to charge thereon." In the case of *Jackson* v. *State,* 91 *Ga.* 272, it is decided that, "Where there is nothing in the evidence to indicate that the killing was not

voluntary, and where no charge is requested on that subject, involuntary manslaughter is not an issue in the case, and no allusion should be made to it in charging the jury, even though the prisoner's statement by indirection suggest such a theory." Besides, at the conclusion of the judge's charge, he inquired of counsel if there was "anything particular" they desired charged; and he received from counsel for the accused a response in the negative. If instruction on involuntary manslaughter was desired in behalf of defendant, the opportunity of making the request was certainly given counsel by this inquiry of the court. We think the evidence in this case was sufficient to sustain the verdict of guilty, and, there being no error of law committed by the court, we will not interfere with the discretion of the trial judge in overruling the motion for a new trial.    *Judgment affirmed. All the Justices concurring.*