## 9474.　McDONALD v. THE STATE.

1. The excerpts from the charge of the court, complained of in the 1st and 4th special grounds of the motion for a new trial, are subject to the criticism that they are argumentative; and those complained of in the 2d and 3d special grounds are not accurate statements of the law.

2. The admission of certain testimony as complained of in the 6th, 7th and 15th special grounds of the motion, if erroneous, was not such harmful error as requires the grant of a new trial.

3. The 8th special ground of the motion for new trial takes exception to the admission of certain testimony offered by the State, over the defendant's objection. It does not appear, however, from the question or

the answer, to what person the testimony had reference; and it being necessary to refer to other portions of the record in order to understand it, this ground can not be considered.

4. No error appears in the rulings of the court on the admission of testimony as complained of in the 9th, 10th, 11th, 12th, 13th, and 14th special grounds of the motion for a new trial.

5. It was harmful error, under the facts of this case, to admit, over the timely objection of the defendant, testimony showing the good character of the deceased.

6. Under the facts as disclosed by the record, the court erred in failing to give in charge to the jury the law of involuntary manslaughter in the commission of an unlawful act.

DECIDED NOVEMBER 18, 1918.

Conviction of manslaughter; from Fulton superior court,—Judge Hill. December 5, 1917.

The defendant was indicted for murder and was found guilty of voluntary manslaughter. He was charged with killing a Chinaman named Jung. He filed a motion for a new trial upon a number of grounds. In the 1st, 2d, 3d, and 4th special grounds exception is taken to the following excerpts from the charge of the court:

1. "Murder is the unlawful killing of a human being in the peace of the State by a person of sound memory and discretion, with malice aforethought, either express or implied. Murder is not the killing of a citizen of Georgia; murder is not the killing of a citizen of France, or a citizen of England, or citizen of Germany. Murder is the killing of a human being in the peace of the State. If the jury should permit any feeling to get into that box against the dead man because of his nationality, it would be not only a dishonor to the high duty which you are called upon to perform, but would be an injustice to the dead man and an insult to the flag of your country. Every man who comes into Georgia, wherever he comes from, whoever he is, is entitled to protection by the laws of Georgia, and every man who comes into the State of Georgia, wherever he comes from, and commits a crime in the State of Georgia, is subject to be punished by the laws of the State of Georgia; and if he happens to be a native of a State of this Union who kills a Chinaman in the State of Georgia, if the jury, under the evidence and the law, believe the Chinaman was a human being and was in the peace of the State, and was killed by a person of sound memory and discretion, with malice aforethought, it would be the sacred and sworn obligation of the jury to convict that man of murder."

2. "He (the defendant) is presumed, and every man is presumed, to intend not only the natural and probable consequences of his act, but the possible consequences of his unlawful act."

3. "If a man use a deadly weapon in such manner as would naturally and probably or possibly produce death, he cannot be heard to say that he did not intend to kill, if he does in fact kill."

4. "Now, gentlemen, is hatred of a man a delusion? The court leaves you to say. Is hatred of a race a delusion? Is that a fact? Is that an imaginary thing? Is that something that does not exist? To be a delusion, it must be an imaginary fact, affect the mind of the man alone. Is hatred that sort of delusion,—hatred of a man, hatred of a race, or fear of a man, a fear of a race? If you believe it is, and this man had that sort of delusion, and it was in control of his will and his intelligence and his mind and his memory, took possession of him, and it was his delusion, and not his criminal intent that caused him to commit this crime, if you believe that, or have a reasonable doubt about it (I will even put it that strong), the court thinks you should give the benefit of the doubt to the defendant."

A number of grounds of the motion for a new trial complain of rulings in the admission of testimony. These are dealt with in the headnotes and in the opinion.

*Colquitt & Conyers, Jerome Simmons,* for plaintiff in error.

*John A. Boykin, solicitor-general, E. A. Stephens,* contra.

HARWELL, J. (After stating the foregoing facts). The 5th special ground of the motion for a new trial is as follows: "Because the court erred, as movant avers, in failing and declining to submit to the jury the question of whether or not the defendant was guilty of involuntary manslaughter in the commission of an unlawful act, and in failing and declining to instruct the jury as to the law upon this subject. It is stated as a matter of fact that a written request was presented on behalf of the defendant for this charge, which request was submittted before the beginning of the general charge." The evidence shows that the defendant and the deceased, a Chinaman named Jung, had some dispute about a concession at the Southeastern Fair which was being operated by the Chinaman. They had some words, and the defendant turned and was leaving the Chinaman's concession when the Chinaman made some remark. The defendant turned back and asked, "What did you say?" The

Chinaman at first made no answer, and when the defendant repeated the question he replied: "Too many bosses," or "too much boss, I won't move out, too much boss," whereupon the defendant struck the deceased with his fist, and then quickly drew from his pocket a "billy" and struck the Chinaman one blow with it, felling him; and almost immediately got down beside the injured man and attempted to revive him. The defendant in his statement said: "Then he [the deceased] said he never saw such a place in his life, there were too many bosses, and he became very much enraged and excited, and then he struck at me with this, and I knocked the lick off with my arm; then he struck me again, it stunned me right smart, struck me along here somewhere (indicating); then I hit him, and then I started immediately, went to work on him to revive him. I had no idea I had hurt him. . . He hit me with this. When I left I took that with me, and if I had wanted to kill that Chinaman I could have shot him. I had a gun on my person. I am required to carry a gun in my line of business. . . . I want to tell you I had no idea about hurting him, only keeping him from injuring me. . . I want you to know I had no intention in the world of injuring this Chinaman in any shape, form, or fashion. I was simply trying to protect myself from this dangerous weapon. If I had wanted to have hurt him, I could have shot him,—if I had wanted to have killed him. I was scared and never thought of hurting him in any way."

In *Taylor* v. *State,* 108 *Ga.* 384, 390 (34 S. E. 2.), where the weapon used was "a piece of wood", the Supreme Court said: "It was not affirmatively shown that the "piece of wood" was a weapon likely to produce death, and the mere fact that death resulted from its use did not necessarily make the killing murder. . . 'There can be no involuntary manslaughter where the intention is to kill. If there is any evidence to cause a doubt, even though slight, as to the intention to kill, the court should give in charge the law of involuntary manslaughter.' Of course a prisoner's statement, if believed by the jury, may constitute the basis of such a doubt, as well as the sworn evidence." *Jackson* v. *State,* 76 *Ga.* 473, was cited. In *Chapman* v. *State,* 120 *Ga.* 855, 857 (48 S. E. 350), where the weapon used was "a brick, thrown at the deceased," the court said: "The evidence is silent as to the size and weight of the brick, and as to whether it was a deadly weapon, or was used

in such a manner as that the ordinary consequences of the act would have produced death. . . The defendant disclaimed any intention to take the life of the deceased. . . And if the brick was hastily picked up and thrown with no intention of killing the deceased, and the evidence failed to disclose that the brick was either a deadly weapon or was thrown in such a manner as ordinarily would have produced death, the homicide would be involuntary." In *Jordan* v. *State,* 124 *Ga.* 780, 781 (53 S. E. 331), where the weapon used was a "rock", the court said: "If there was no intent to kill the accused was not guilty of murder, unless the killing happened in the commission of an unlawful act which in its consequences naturally tended to destroy the life of a human being. . . . In determining whether the killing happened as the result of an act naturally tending in its consequences to destroy the life of a human being, much will depend upon the size and character of the rock. On this vital point the evidence, at its best, is vague, uncertain, and unsatisfactory. . . . Where all the circumstances are such as to preclude the idea of deliberation, and where the weapon used is one caught up hastily, a killing resulting from the use of such a weapon is not generally murder, but only involuntary manslaughter;" citing *Ray* v. *State,* 15 *Ga.* 223; *Henry* v. *State,* 33 *Ga.* 441; *Crawford* v. *State,* 90 *Ga.* 709 (17 S. E. 628, 35 Am. St. R. 242) ; *Taylor* v. *State,* supra. In *Kelly* v. *State,* 145 *Ga.* 212 (88 S. E. 823), where the weapon used was the "limb of a tree", the court said: "Under the evidence, . . . it was for the jury to say whether the implement with which the blow was inflicted was a weapon likely to produce death when employed in the manner in which it was shown to have been used; and while the jury would have been authorized to find that it was such a weapon, the evidence was not of such a character as to demand a finding that the implement was a weapon likely to produce death and that the blow was struck with intent to kill. The evidence would have authorized a verdict of involuntary manslaughter in the commission of an unlawful act. . . . It was erroneous, therefore, to omit to charge the law of involuntary manslaughter." In that case a witness testified that the stick used was fifty-eight inches long and eight and one half or nine inches in circumference. See also *Farmer* v. *State,* 112 *Ga.* 80 (37 S. E. 120), where the weapon used was "a thick, dark-colored beer-

bottle," thrown at the deceased and broken when it struck his head, and *Dorsey* v. *State, 126 Ga.* 633 (55 S./E. 479), where the weapon used was the large end of a billiard cue—about four feet long and an inch or more in diameter at the large end. In both of these cases the Supreme Court reversed the trial court for failure to instruct the jury upon the law of involuntary manslaughter. In *Cain* v. *State, 7 Ga. App.* 24 (65 S. E. 1069) the court said: "If the theory of manslaughter is raised by the defendant's statement alone, a charge on the law of manslaughter would be proper; and if timely requested, a refusal to so change would be error." See also *Lyman* v. *State,* 89 *Ga.* 337 (15 S. E. 467); *Joiner* v. *State,* 129 *Ga.* 295 (58 S. E. 859); *Anderson* v. *State,* 130 *Ga.* 364 (60 S. E. 863).

The evidence in the instant case failed to disclose that the "billy" with which the deceased was struck was either a deadly weapon or was used in such a manner as would ordinarily have produced death. It does appear that the weapon was hastily drawn and the blow quickly delivered, and that almost immediately the defendant got down on the ground, or floor, in an effort to revive the unconscious man. The defendant disclaimed any intention to take the life of the deceased.

Under the facts as shown by the record, and the authorities cited, we think that the court should have charged the jury upon the subject of involuntary manslaughter in the commission of an unlawful act, and the failure to do so was erroneous.

Several of the grounds of the motion for a new trial complain of the admission, over objection of the defendant duly made, of the testimony of a number of witnesses showing the good character for peaceableness of the deceased Chinaman. The State insisted that this evidence was admissible because the defendant—so the State claims—had put the deceased's character in issue. We can not agree with this contention of the State. The defendant did not put in issue the character of the deceased. In the defendant's statement at the trial, in order to support his defense of delusional insanity, he said that since he had a difficulty with two Chinamen in Mississippi, he had always been afraid of them—the Chinese people; that he had always known they were treacherous, and had never allowed them on the fair grounds in his career in Mississippi. It would seem from the language used in *Crawley* v.

*State,* 137 *Ga.* 777 (74 S. E. 537), by Mr. Justice Beck, that a defendant in his statement can put in issue the character of the deceased, so as to authorize the introduction by the State of evidence of good character of the deceased. It will be noted, however, that in the *Crawley* case the defendant, by evidence offered, put in issue the character of the deceased, so that in that case the evidence was admissible regardless of the defendant's statement. However, in the instant case it is not necessary to determine that question. There is nothing in the defendant's statement in this case which puts in issue the character of the deceased. His statement that on account of the previous difficulty he had had with two Chinamen in Mississippi, he was afraid of the Chinese race, and that they were treacherous as a race, we do not think is sufficient for this purpose. Neither does the statement of the defendant that the deceased was making an attack on him at the time that he struck the deceased justify the introduction of this evidence of good character. "We do not think that proof of an attack by the deceased upon the defendant at the time of the homicide is sufficient to warrant proof of his peaceable character." *Worley* v. *State,* 138 *Ga.* 336 (75 S. E. 240). Neither does the testimony of Stripling, one of the State's witnesses, to the effect that after the difficulty between the defendant and the deceased the defendant said that the deceased was a dangerous Chinaman and that he was afraid of him, authorize the introduction of this evidence as to good character. This was evidence offered by the State. It certainly would not be seriously contended that the State can offer evidence of the deceased's character for violence by a statement made by the defendant, and thus lay the foundation for the introduction of evidence of good character for peaceableness in rebuttal.

Reluctant as we are to disturb the verdict of the jury, the defendant is entitled to a fair and impartial trial according to the forms of the law. The admission of this illegal testimony, delivered by a number of prominent and influential citizens, was unquestionably harmful to the defendant.

In connection with these grounds of the motion it is stated that one of the counsel assisting in the prosecution stated in open court, in the hearing of the jury, that he had fifty or one hundred more witnesses who would swear exactly the same thing, that is, as to the good character for peaceableness of the deceased. It does

not appear, however, that this improper remark, made in the presence of the jury, was heard by the court, or the attention of the court was called to it.

Because of the errors hereinbefore pointed out a new trial is necessary. The other rulings stated in the headnotes require no elaboration. The assignment of error upon the refusal of a continuance, and the general grounds of the motion for a new trial, are not passed upon.

*Judgment reversed. Broyles, P. J., and Bloodworth, J., concur.*

BROYLES, P. J., concurring specially. I concur with my associates that, under the facts of the case, including the statement of the accused, the court committed reversible error in refusing to instruct the jury upon the law of involuntary manslaughter, a timely written request therefor having been presented. I am, however, not at all sure that the admission of the testimony as to the good character of the deceased Chinaman for peaceableness was erroneous, under all the peculiar and particular facts of this case. In his statement to the jury the defendant asserted that on a former occasion in California, while asleep, he had been sandbagged by a couple of Chinamen and left in an unconscious condition; that afterwards, on the State Fair grounds in Mississippi, he was badly beaten over the head with some kind of a weapon by two Chinamen, and "I have been always afraid of them—the Chinese people. I have always known they were treacherous, and I have never allowed them on the fair grounds in my career in Mississippi. . . . Last year, or year before last, I was associated with this fair (of the Southeastern Fair Association of Atlanta), and I absolutely refused Chinese concessions, on account of my fear [of] being thrown with them. . . Since my trouble in California I have always been afraid of the Chinese race. I know them and have heard of them, and in my condition——This fellow [the deceased Chinaman], he used Chinese language I could not understand, and it appeared to me that he was trying to injure me with this weapon" (a two or three-pronged iron instrument used in cooking ice-cream cones). The defendant in his statement further said that without any provocation on his (the defendant's) part, the deceased, on the occasion of the fatal difficulty, "became very much enraged and excited, and then he struck at me with this [the cooking-iron], and I knocked the lick off with my arm, then

he struck me again, it stunned me right smart, struck me along here somewhere (indicating)., then I hit him." According to the statement of the defendant (and the jury had the right to believe it in preference to the sworn testimony), when properly construed as a whole, the Chinese race was a treacherous and dangerous race of people, and the deceased was no exception in this respect, but was himself a violent and dangerous man. Moreover, in addition to these averments in the defendant's statement, the secretary of the Southeastern Fair Association (who was the employer of the defendant) testified that on the afternoon of the fatal difficulty, and shortly after it had occurred, the defendant told him that the deceased was "a dangerous Chinaman", that he was "a very bad, dangerous fellow." This evidence went to the jury without any objection from the State or the defendant, and on cross-examination by the defendant's counsel the witness was questioned further about this statement of the defendant as to the deceased being a dangerous man. It is true that this witness was introduced by the State. It is also true that ordinarily the State can not prove the bad character of the deceased for violence, and thus lay the foundation for proving his good character. But it must be remembered that in this instance the witness for the State did not *himself* testify that the deceased was a dangerous man, but testified that *the defendant had so stated to him.* Further, it does not appear from the record that the witness was asked by the State's counsel as to what the defendant said about the dangerous character of the deceased, but the fair inference from the evidence is that the witness (who was introduced in rebuttal, after the defendant had made his statement about being afraid of Chinamen, and that on account of this fear he had always refused concessions to Chinese on fair grounds) was asked merely if, when he instructed the defendant to draw up the contract between the Fair Association and the deceased Chinaman for a concession on the fair grounds, the defendant had objected to this concession being granted, on account of his fear of the deceased. Under all these particular circumstances, *the evidence as to the dangerous and violent character of the deceased having gone to the jury,* I am not prepared to hold that it was error to allow the State to introduce witnesses to rebut this testimony by showing his good character for peaceableness.

As to the remaining special grounds of the motion for a new trial: Some of them are so incomplete as to require reference to other portions of the record, and, under repeated rulings of this court and of the Supreme Court, can not be considered; the others, in my opinion, show no reversible error.