## BRYANT v. THE STATE.

1. Under the evidence in this case the law of involuntary manslaughter was not involved, and the court did not err in failing to charge upon that subject.
2. The court did not err in charging the law of implied malice, as contained in § 62 of the Penal Code, there being evidence from which the jury would have been authorized to find that the weapon with which the mortal wounds were inflicted upon the decedent was a weapon likely to produce death, and that the killing was murder.
3. Under the issues made by the evidence and the prisoner's statement, it was not error for the court to give in charge to the jury § 70 of the Penal Code, relating to justifiable homicide, and to charge immediately afterward section 71, which provides that the fears under which the homicide is alleged to have been committed must be reasonable, etc.
4. After a review of the case of *Price* v. *State*, 137 *Ga.* 71 (7), the court adheres to the ruling made in that case; and under the ruling there made, the exception to the court's charge to the jury in the language of section 65 of the Penal Code is without merit.
5. The court charged the jury as follows: "It [the verdict] should be voluntary manslaughter if the surrounding circumstances were such only as to excite the fears of a reasonably courageous man that some serious bodily harm less than a felony was intended or might accrue upon the accused." This charge was applicable to one theory of the case, and was not erroneous because the court did not instruct the jury as to the right the defendant would have had to use all necessary force to eject the decedent from his home.

No. 3841. JANUARY 15, 1924. REHEARING DENIED MARCH 1, 1924.

Murder. Before Judge Custer. Grady superior court. May 12, 1923.

*J. A. Pope* and *S. P. Cain,* for plaintiff in error.

*George M. Napier,* attorney-general, *B. C. Gardner,* solicitor-general, *Seward M. Smith,* assistant attorney-general, *M. L. Ledford,* and *Billie B. Bush,* contra.

BECK, P. J. Ira Bryant was tried under an indictment charging him with the offense of murder; and the jury trying the case returned a verdict of guilty, without a recommendation. The defendant made a motion for new trial, which was overruled, and to the judgment overruling the motion he excepted.

It appears from the evidence that on the evening of the homicide Jim Lewis, the decedent, accompanied the accused to the latter's home. It was late in the afternoon. About 9:30 o'clock that night Dr. C. H. Maxwell was summoned to visit the decedent, who was still at the defendant's home. He found Lewis upon his knees and arms on the floor and his head was on the floor. The man was

badly wounded, was not conscious at the time of the doctor's arrival. There were several wounds on the back of his head. "They were spread out from either ear; one was near the ear on one side and one near the other ear, and several across the back portion of the head, cuts, something like six or seven, and there was one just below his nose across his face, about three inches long. Later on I found a wound on his elbow, which looked as if he had fallen on a nail, and there appeared to be some bruises about on his body. The wounds did not look so bad, there were gashes from two to three inches long, six or seven of them being on the back portion of his head and one on the front. The floor was covered with blood, pools of blood and clotted blood, the blood having run across an adjoining room for a distance of about twelve feet or more. The clothing of the decedent was saturated with blood." The doctor further testified that in his opinion the blood came from the wounds on the head. Two days later Lewis died as the result of the wounds.

T. L. Langley, a witness for the State, testified in part as follows: He went down to the home of the accused. The wife of the defendant had come to his house, and two of the defendant's children came a few minutes ahead of her. At the request of the wife of the accused Langley went for a physician. When he returned to his home he found the defendant standing in the hall. The latter had a piece of lightwood in his hand. (The piece of wood was produced in evidence.) The defendant requested Langley to go down to the house with him and see if he knew the man whom he had hit. He said it was an old man, he did not know who it was; that he came into the house, pushed the door open, walked in there on them, and he took this piece of wood and fired in on him and gave him considerable beating. "He told me he beat him right sharp while he had been down there, and that he didn't know whether he had killed him, and he said if he hadn't killed him and I said so, he would go in and finish it. I said, 'I don't say so; I expect you have [done] too much already.' We went in and looked at the old man, who was between the door and the fireplace. . . I saw nothing around the body of Mr. Lewis but blood. There was a puddle about two feet square, and it had run down in the other room. While we were dressing the old man's wounds, the defendant said if he had known it was old man Lewis he would not

have done it. The defendant did not act like a drunk man, he did not stagger, and I would not deem him drunk. He said they were all sitting around the fire when the old man came in the room. . . The defendant said when the old man came in the house that defendant's wife said he had a knife, but that he did not see the knife, and that he took a piece of wood then and knocked him down."

Mrs. T. L. Langley, sworn as a witness for the State, testified: The accused came to their house and inquired for Mr. Langley; said he wanted to see him. She told him to go back to his home, and her husband would be there. The defendant replied that he didn't want to go back until Mr. Langley came, and would go back with him. The accused had "a billet of wood" in his hand, which had blood on it. He turned to his wife and said he had not beat him none when she left to what he had after she left; that he beat him to his satisfaction. She further testified that he did not appear to be drunk. A piece of wood, identified by the witnesses as that which was carried by the defendant to T. L. Langley's, is about 18 inches long and about three inches thick, triangular shaped.

The defendant introduced evidence tending to show that the decedent had an open knife. Louise Bryant, the daughter of the defendant, ten years old, was sworn as a witness for the defendant. She testified that Lewis came home with her father; that he stayed at their home till about dark; and further, to quote a part of the witness's testimony in her own language: "Mr. Lewis stayed there a good while. He stayed until about dark, when he left. I saw father hit a man there that night. I did not know who the man was. We were fixing to go to bed, the fire was nearly out, and the lamp was turned down. Mother and father were sitting by the fire. The man did not knock on the door. The first I saw of him he was standing in the door with a knife in his hand. Mother hollered, and father said, 'I'll have to do something,' picked up a piece of wood and hit him. Mother said, 'Look there,' and Papa said, 'I've got to do something, or he'll hurt us,' and picked up a piece of wood and hit him and knocked him up side of the door, and Mama told me to go to Mr. Langley's and get him to come down there and help us. I went to Mr. Langley's, and then Mama came and got Mr. Langley to go for the doctor. Papa came up

there, and Mr. Langley came back from the doctor's house, and Papa brought the piece of wood with him, and Papa and Mr. Langley went back to our house to see who it was. I do not remember what Mr. Lewis did when he first got to our house that afternoon. I went in the house. Mr. Lewis went around behind the house, and later came in the house with Father. Mr. Lewis left after he stayed there a right good while. He and Mother and Father were sitting around the fire. He did not eat any supper; neither did Father eat any supper. Mother and brother and I ate supper. Father and Mr. Lewis were sitting at the fire while we were eating supper, and drank some while they were sitting at the fire. After supper I stayed in the room about an hour or more. Mr. Lewis got drunk and got sick before he left there, and had to vomit on the floor; that is not the reason Father hit him. He went out of the door and then came back. He vomited on the floor and got up and went out; after he came back was when Father hit him. I went to get somebody to help Mother make Father quit beating old man Lewis, but I didn't know it was old man Lewis until Papa and Mr. Langley came back. I did not see Father hit him but one lick. Father hit him because he vomited on the floor. He fell out of the chair on the other side from Mother. Father hit him while he was sitting in the chair. I did not see the handle of his knife, but I saw the blade of it. He had it drawed on Father. Mr. Lewis got mad with Papa at home because he told him to get up and go out of doors. He got up and left and was gone a good little while. When he came back he never did sit down. Mother screamed when he came back in the door before Father hit him. Mother had just gotten up from pneumonia, and left the room because she couldn't stand it." The witness further testified, in response to questions propounded to her: "Q. When you saw Mr. Lewis sitting in the chair and your father got the piece of wood, your mother begged him not to hit him? A. Yes, sir. Q. And then you ran to get Mr. Langley to keep your father from beating Mr. Lewis? A. Yes, sir. Q. And soon your mother came up to Mr. Langley's? A. Yes, sir. Q. And your papa came on up there and brought that same piece of wood that he hit old man Lewis with? A. Yes, sir. Q. When you say your father hit Mr. Lewis, was he sitting in the chair or was he standing at the door? A. He was standing near the door. Q. He was not sitting

in a chair then, was he? A. No, sir. Mother begged Father not to hit Lewis after Father got the piece of wood."

The defendant made a statement in which he narrated the circumstances leading up to the decedent's accompanying him home and what took place while he was there, up to the time the decedent was about to depart; and he continued: "As he started to go he asked me if I had anything to drink, and I told him, yes, I had a little corn beer, and he drank two glasses of corn beer and I drank one, and me and him was sitting there in front of the fireplace and talked, and he put in and was spitting on the floor, and I says, 'Mr. Lewis, I rather you not be spitting on the floor,' and he told me if I didn't want him to spit on the floor he would go home, and I told him, well, I would rather he would go home than to be spitting on the floor; and Mr. Lewis got up then. I reckon it was just about dusk dark. He got up to go home, and he was gone and gone and gone, and I thought he had gone home; and I suppose it was about eight o'clock when he came back, and when he come in I was sitting by the wood-box in one corner of the room with my back to front door, and my wife was sitting over on the other side of the fire, and two of my little children was sitting in front of the fire; and when Mr. Lewis come in, didn't anybody know he was on the place. He didn't knock before he come in; when he come in he opened the door, and the first thing I knowed he shoved the door open, and he had a knife drawed back in his right hand. I had my back to the door, and whenever he shoved the door open and my wife saw him with the knife drawed back in his hand, she screamed and says, 'Ira, somebody is coming on you with a knife,' and about that time I got up, and I had this piece of wood in my hand and he was coming on me with the knife, and I struck him side of the head and knocked him up side of the wall, and when I knocked him down he got on his hands and knees like he was going to get up, and I says, 'Don't you get up, don you get up,' and he was getting up and I hit him on the back the head. I don't know whether my wife was there when I him the second time or not, but when I hit him the first time two children went out of the house to go to Mr. Langley's. When I hit Mr. Lewis he was coming right on me with a knife, and when I hit him I knocked him up side of the walls and his head fell over in the dark, and when I hit him he fell on his face, and

he got up on his hands and knees, and I says, 'Don't you get up, I'll hit you,' and I stood there with the piece of wood in my hand, and I stood there it seems to me like half an hour, and I called my wife, and there wasn't anybody there but me and him. After I done like I did I stood off far enough from him that he couldn't reach out with his hands and pull me up to him. I don't know what he come in there for. And after I beat him like I did I struck two matches,—standing off far enough from him that he couldn't reach me, and I held the matches over as best I could to see if I could tell who he was, and he was laying down on his face like this [indicating], and I struck two matches to see if I could tell who he was, and after I stayed there a few minutes I tiptoed around by his feet—I didn't know how bad I had beat him—I tiptoed around his feet and slipped out on the front porch, and when I got out on the porch I peeped around the door to see if I could see him move, and I didn't see him move, and I jumped out of the house then and run up to Mrs. Langley's." In his statement he further related how he went to the doctor's, and the doctor's visit to his home.

1. Grounds one and two of the amended motion for new trial assign error upon the failure of the court to charge the law upon the subject of involuntary manslaughter. There was no request to charge upon this subject, and we are of the opinion that whether the homicide was involuntary manslaughter or not is not raised by the evidence in the case. If it would have been appropriate, under the statement of the prisoner, the failure to give the charge, in the absence of a request therefor, is not error. We do not over-look the fact that there are certain decisions, like that of *Joiner* v. *State,* 129 *Ga.* 295 (58 S. E. 859), *Dorsey* v. *State,* 126 *Ga.* 633 (55 S. E. 479), and *Jordan* v. *State,* 124 *Ga.* 780 (53 S. E. 331), in which it was held that where the accused struck the deceased with a weapon suddenly snatched up, which is not necessarily a weapon likely to produce death, the law of involuntary manslaughter was involved. There are several other cases following the cases mentioned, which we have not cited. But it will be found in most of them that the accused suddenly seized the weapon and struck one or two blows with the same. In some of them the blows were struck hastily in the course of a fight between the accused and the deceased. All of them differ in essential facts from the present

case. In this case the decedent was struck down, probably by the blow which inflicted the wound across his face, and then, when the wounded man was down, the accused rained blows with a heavy weapon upon the back of his head, covering the back of his head with dangerous wounds. After knocking him down he continued to inflict blows upon him until he had inflicted mortal wounds. There can be no involuntary manslaughter in such a case as that. It is true that in the case of *Kelly* v. *State*, 145 *Ga.* 210 (88 S. E. 822), it was ruled that involuntary manslaughter was involved, and in that case the accused struck the decedent several times on the back of his head and shoulder "with the limb of a tree," and the accused said, while striking the deceased, "I will kill you." It appeared that the limb of a tree, or stick, which was used was a large one, some 58 inches long and 8 or 9 inches in circumference; and this court said, reversing the judgment of the court below for the failure to charge upon the subject of involuntary manslaughter: "Under the evidence, if the accused was the person who did the killing, it was for the jury to say whether the implement with which the blow was inflicted was a weapon likely to produce death when employed in the manner in which it was shown to have been used; and while the jury would have been authorized to find that it was such a weapon, the evidence was not of such character as to demand a finding that the instrument was a weapon likely to produce death and that the blow was struck with the intent to kill. The evidence would have authorized a verdict of involuntary manslaughter in the commission of an unlawful act. *Dorsey* v. *State*, 126 *Ga.* 633 (55 S. E. 479); *Joiner* v. *State*, 129 *Ga.* 295 (58 S. E. 859); *Anderson* v. *State*, 130 *Ga.* 364 (60 S. E. 863). It was erroneous, therefore, to omit to charge the law of involuntary manslaughter."

But in the case of *Thornton* v. *State*, 107 *Ga.* 683 (33 S. E. 673), this court held that under the evidence in that case there was reasonable theory upon which the defendant could have based his contention that if he was guilty of any crime at all it was involuntary manslaughter. From the record in that case it appears that the accused killed his wife; he beat her violently, and she ran from the house after a severe blow was inflicted upon her head. The defendant struck her with a rock and knocked her to the ground. She arose and endeavored to escape, and finally some one came to

her rescue, and while they were trying to protect her the defendant threw another rock or brickbat and knocked his wife to the ground. She again arose and made an effort to escape, when another rock or brickbat was hurled against her head by her husband, knocking her into a ditch or ravine, where she remained still as if dead. The defendant then approached her and threw another missile at her; then left the scene and returned to his house. The wife cried out for help while the assault was being made upon her. The wounds upon her head were severe and extensive. It is probable that her death was immediately caused by falling into a ravine, into which she had been knocked when the accused threw a brickbat against her head. The facts stated above were contradicted by witnesses for the defendant. Upon a record containing substantially the facts stated above this court said: "Under the evidence in this record we can see in it no element of involuntary manslaughter. It was earnestly insisted by counsel for plaintiff in error that there was no proof that the missiles used by the assailant were of such a character as to·have this tendency and effect. Had there been such evidence it would have amounted to nothing more than an opinion of a witness, from which the jury might have disagreed and formed an independent opinion of their own. When the facts are given from the stand, the jury can form their own opinion from them, without receiving the aid of an opinion from others. The proximity of the parties, the wounds made by the blows, the effect of these blows in felling repeatedly to the earth the assailed, the persistent attack, followed up with rocks and brickbats while the victim was fleeing and pleading for her life, and all the circumstances of this case, were certainly sufficient to authorize the inference that there was an intention to kill; and the attacks having resulted in the death of the deceased we think excludes every idea of the absence of such intention. The only theory upon which we see that the defendant can possibly claim that he was entitled to a charge upon the subject of involuntary manslaughter is based upon his statement of an absence of any intention whatever to inflict the blow that resulted in the death of the deceased." There may be a conflict in the rulings made in the *Kelly* case and the *Thornton* case; both cases are closely in point upon the question now under consideration. If there is a conflict, the latter case, that of *Kelly* v. *State,* must yield to the former ruling, it being a decision by a

full bench of six Justices. We do not think that in any view of the evidence in the instant case the law of involuntary manslaughter was involved.

2-4. The rulings made in headnotes 2, 3, and 4 require. no elaboration.

5. Error is assigned upon the following charge of the court: "It [the verdict] should be voluntary manslaughter if the surrounding circumstances were such only as to excite the fears of a reasonably courageous man that some serious bodily harm less than a felony was intended or might accrue upon the accused." It is contended that this charge is erroneous, standing as it does, "without also at the same time instructing the jury that the defendant had the right to eject the deceased from the defendant's home, and that he had the right to use whatever force was necessary to successfully accomplish the ejection in case the deceased resisted." The charge is correct as applied to one theory of the case presented by the evidence; that is, that the decedent was about to make an assault upon the accused. If in the prospect of such an assault the accused, acting under the fears of a reasonable man that a felonious attack was about to be made upon him, and the circumstances were such as to justify those fears, then the killing of the decedent would have been justifiable. But if the circumstances did not justify the fears of a reasonably courageous man that the attack was one felonious in its character, but that it was an assault upon him in which a serious injury less than a felony was being attempted, then the homicide would be reduced to voluntary manslaughter. If the defendant had desired instructions to the jury as to the right of the accused to eject the decedent from his house and the degree of force which he might use in doing this, he should have requested a charge upon the subject, and the court then might have given the charge, if in the opinion of the court there was any evidence to authorize it. But it does not appear to us that there was any effort made by the accused to eject the decedent from his house; for he almost immediately struck him with a piece of wood in his hand, felled him to the floor, and then beat him until a mortal wound was inflicted.

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Atkinson, J., who dissent from the ruling in the first division.*

Russell, C. J. I dissent from the judgment of affirmance solely upon one ground. There is, in my opinion, evidence in the case, which, if credible to the jury, might have authorized them to find the defendant guilty of involuntary manslaughter, that is, that the blows were inflicted without any intention at the time to kill. The charge upon voluntary manslaughter (which necessarily includes an intention to take human life) does not obviate the necessity, where there might be a conviction for involuntary manslaughter, to charge upon the latter subject because the latter relates to a killing where such a result was not intended. In my opinion, as ruled in *Kelly* v. *State*, 145 *Ga.* 210 (supra), in any case where a jury, considering the nature of the weapon used and all and any of the attendant circumstances in the assault which produces death, might find from any of the testimony that the defendant had no intention to kill, the law of involuntary manslaughter should be given and the question submitted to the jury for their determination. In the present case, personally, I believe from the evidence that the defendant did intend to kill; but that question is not for a court but for the jury, and wherever involuntary manslaughter is involved they should be instructed upon the law applicable thereto.