24180. SMITH *v.* THE STATE.

DECIDED NOVEMBER 5, 1934.

*Hugh E. Combs,* for plaintiff in error.

*J. Cecil Davis, solicitor-general,* contra.

MacINTYRE, J. The indictment in this case charges that on December 24, 1933, in Wilkes county, Georgia, Jim Smith committed murder by "striking Tucker Smith with a certain rock, and thereby inflicting upon the said Tucker Smith a mortal wound." Having been convicted of voluntary manslaughter, the defendant moved for a new trial upon the general grounds and certain special grounds. He excepts to the overruling of the motion.

The ninth special ground avers that the court erred in failing to charge "the law relative to involuntary manslaughter in the commission of an unlawful act." There having been no timely written request that such a charge be given, the question for determination is whether the *evidence* required the charge. See *Parks* v. *State,* 105 *Ga.* 248 (31 S. E. 580) ; *Cain* v. *State,* 39 *Ga. App.* 128, 133 (146 S. E. 340). Of course, the very essence of involuntary manslaughter is "the killing of a human being without any intention to do so." Penal Code (1910), § 67. "There can be no involuntary manslaughter where the intention is to kill. If there is any evidence to raise a doubt, even though slight, as to the intention to kill, the court should give in charge the law of involuntary manslaughter, but if there is nothing to raise such a doubt, the failure to charge on that subject will not require a new trial." *Jackson* v. *State,* 76 *Ga.* 473 (3). See also *Crawford* v. *State,* 12 *Ga.* 142 (6) ; *Griffin* v. *State,* 18 *Ga. App.* 462 (5-a) (89 S. E. 537) ; *Cain* v. *State,* 39 *Ga. App.* 128 (2) (146 S. E. 340) ; *Jackson* v. *State,* 43 *Ga. App.* 468 (159 S. E. 293) ; *Miller* v. *State,* 46 *Ga. App.* 685 (168 S. E. 917) ; *Thomas* v. *State,* 47 *Ga. App.* 237, 239 (170 S. E. 303.) ; *Freeman* v. *State,* 158 *Ga.* 369 (2-a) (123 S. E. 126).

Let us then see if there is any *evidence* in the case that raises a

doubt as to the intention to kill. At about eleven or eleven thirty o'clock on the night of December 24, 1933, the defendant struck and killed his father, Tucker Smith, with what appears to have been a rock. The trouble appears to have started when the defendant either cursed in the presence of his mother, Maggie, or cursed her. We quote from the testimony of Toombs Walton, the only eye-witness to the tragedy: "Tucker told him if he had to curse Maggie, he would have to get out. Jim told him he could get out; . . he got out. His daddy raised up to get the gun before he went out. . . It was a double-barrel gun. Tucker got the gun after Jim had cursed his mother. Jim did not go out of the house right then. I taken the gun away before he did. . . Tucker got Jim's clothes and come to the porch and throwed them out to him. . . When Tucker carried Jim's clothes to the porch, Jim threw a rock. The first rock, he missed, and the second rock, he hit him in the left side and he fell out of the porch. . . I could see Jim when he threw the rocks. He did not hit him when he threw the first rock. The rock he hit him with was a good size. . . I went to Tucker and put him in the car. Jim come to help, and there was nothing he could do. . . Jim said, "God damn it, ain't nobody going anywhere. . . What have I done?" . . I waited about thirty minutes before I left. As to why I did not bring him to the doctor promptly, I did not want me and Jim to get into anything." On cross-examination, the witness Walton tes-tified in part as follows: "The gun was not loaded. . . I took the gun away from Tucker and hid it under the house. After that they were in the hall, Jim and Tucker; I left them there in the dark. When I came back Jim was coming out, and I went in the house. Tucker had the clothes. I come on out too. . . I could not see any rock at the time. I did not know he was going to throw until he had throwed. When he throwed the first rock I heard it hit the house, and the next rock hit his papa and he fell out of the door. If Tucker had anything in his hand, I could not have seen it from where I was. . . Tucker was killed on Sun-day night. Maggie asked me to come back over there Monday morning, and I went over there, . . and she picked up a piece of razor where I picked him up. She picked it up where Tucker fell. . . She ain't got anything but the blade. I did not see Tucker cut Jim with that razor. I saw the rock. One of the

rocks was on the porch; the one what hit him. I reckon it bounced off. I don't know whether the one I saw was the one that hit Tucker. One rock was on the porch, and one on the ground; I don't know which one hit him. . . I am satisfied a rock hit him; I know it. It was dark. I knew he threw a rock the first time, but I don't know what he threw the last time. The rock I saw on the porch did not have any blood on it. The one in the yard had blood on it. I don't know where that blood came from. . . I did not go because my mother-in-law (Maggie) asked me not to leave then. She told me that Tucker was mad." Upon re-direct examination, Walton testified: "That house was located in Wilkes county, Georgia. . . The razor was at the steps where the man fell. . . He threw the clothes out in the yard. The razor was between the steps and the clothes." .

Dr. O. S. Wood, who examined Tucker Smith shortly after the homicide, testified: "Tucker Smith was dead. . . I found a crush wound in the region of the heart, with a break of the sixth, seventh, and eighth ribs, in a space of three or four inches. I found him with a bloody nose and mouth. He had blood on some of his clothes. The lick on the left side would have caused his death. That was a mortal wound." The doctor further testified: "I saw Jim Smith that night. . . I did not see any cut on his neck. . . This man wanted me to examine him. . . His shirt had some blood on it. He had some blood on the side of his collar. I think he had a scratch around his face. It looked like a blood-cake; it was not a cut. . . I saw that abrasion. He could have butted into something and got that. Somebody could probably have hit him and done that with his fist. He could have hit him with a stick and done it, but it would have been a mighty small stick. . . I did not pull his collar down."

G. H. Lunceford testified: "I arrested Jim Smith the night that Tucker Smith was killed. I saw a cut on him that night; he had a little bump on top of his head. I did not see any other place where he was cut. There was some blood on his shirt. He did not tell me that night he was cut. I asked him why he killed his daddy, and he said him and his mother got in it and he cursed her out, and him and his daddy got into it and he threw a rock at him. . . I found him at home in bed at the same place of the killing . . "

We quote as follows from the defendant's statement to the jury:

"When he grabbed the gun, I went on out, and they took the gun away from him. He come out and grabbed me. He cut me on the head and cut me on the neck, and he cut my collar all to pieces, and I hit him with a rock. I was not trying to kill him; I was trying to make him turn me loose—he was killing me. There is where he cut me on the neck. My collar was buttoned up, and that is the reason the doctor did not see it."

In *Jordan* v. *State,* 124 *Ga.* 780 (53 S. E. 331), the defendant hit a fleeing woman with a rock that "might be as big as her fist." The woman fell, and an examination disclosed that the third vertebra was broken. The jury found the defendant guilty of murder. The court said: "If there was no intent to kill, the accused was not guilty of murder, unless the killing happened in the commission of an unlawful act which in its consequences naturally tended to destroy the life of a human being. Penal Code [1895], § 67. The throwing of the rock was an assault, and was, of course, an unlawful act. In determining whether the killing happened as the result of an act naturally tending in its consequences to destroy the life of a human being, much will depend upon the size and character of the rock. On this vital matter the evidence, at its best, is vague, uncertain, and unsatisfactory. The principal witness for the State testified that the rock 'looked like it might be as big as my fist. I don't know whether it was or not.' Where all the circumstances are such as to preclude the idea of deliberation, and where the weapon used is one caught up hastily, a killing resulting from the use of such weapon under such circumstances is not generally murder, but only involuntary manslaughter. . . The accused, according to the evidence of the State, was clearly guilty of involuntary manslaughter in the commission of an unlawful act, but the evidence did not authorize a finding that he was guilty of murder. It did not appear beyond a reasonable doubt that there was any intention to kill, nor did it appear beyond a reasonable doubt that the weapon used was one likely to produce death." In *Farmer* v. *State,* 112 *Ga.* 80 (37 S. E. 120), the accused hastily seized and threw at the deceased "a thick, dark-colored beer bottle," which was broken when it struck the head of the deceased. There was evidence from which the jury could have found that the accused, without any provocation whatever, threw the bottle at the deceased. The Supreme Court held that it was

error for the court to so charge the jury as to exclude from their consideration the "law relating to involuntary manslaughter in the commission of an unlawful act." In the case of *Dorsey* v. *State,* 126 *Ga.* 633 (55 S. E. 479), the defendant killed the deceased by striking him with "a billiard cue cut down so that it was used as a walking stick." It appears that this stick was introduced in evidence, and that it was "about four feet long and an inch or more in diameter at the larger end." One assignment of error was that the court failed to charge the law of involuntary manslaughter, and in reversing the judgment the court said: "Under one view of the evidence, the law of involuntary manslaughter in the commission of an unlawful act was certainly involved." In *Anderson* v. *State,* 130 *Ga.* 364 (60 S. E. 863), the evidence introduced by the State "indicated that the accused, who was a strong, vigorous man, killed the deceased, who was  . .   some eighty years of age, by striking him from behind with a stick," the exact size and weight of which did not appear from the evidence. The defendant stated that the deceased poked him in the back with a stick, and he "hastily caught up the root of a tree which was lying near by, and struck the deceased without any intention to kill." The judgment was reversed because the court refused to give the jury a requested charge upon manslaughter. For a summary of many cases holding that various weapons were not deadly, see *McDonald* v. *State,* 23 *Ga. App.* 58 (97 S. E. 448). It appears that in that case the defendant, without sufficient provocation, killed a Chinaman with a "billy." The judgment was reversed because a requested charge upon the law of involuntary manslaughter in the commission of an unlawful act was not given the jury.

Were it not for the fact that the decision in *Kelly* v. *State,* 145 *Ga.* 210 (88 S. E. 822), has been questioned in subsequent decisions of the Supreme Court (*Bryant* v. *State,* 157 *Ga.* 195, 202, 121 S. E. 574; *Carter* v. *State,* 171 *Ga.* 406, 411, 155 S. E. 670), we should certainly cite it as authority for our holding in the instant case, for in the *Kelly* case the attack with "a limb of a tree" was repeated and deadly, the victim's head being crushed like an egg. The case which had the approval of the Supreme Court in *Bryant* v. *State,* supra, is that of *Thornton* v. *State,* 107 *Ga.* 683 (33 S. E. 673), where it was held that involuntary manslaughter was not in the case. In regard to the *Thornton* case, we shall only say that

the attack of the husband upon his fleeing wife with a rock and a brickbat, in spite of her repeated pleas for her life, differentiates that case materially from the one at bar.

In the case at bar, there is nothing to indicate that the defendant had procured in advance any rock, or other weapon, with which to injure his father. When the deceased was struck down, the defendant approached and offered to help, and asked what he had done. The defendant did not try to escape, for the officer arrested him shortly after the homicide, "at home in bed at the same place of the killing." A reasonable construction of the testimony of the only eye-witness to the homicide is that when the deceased came out on the porch and threw the defendant's clothes out in the yard, the defendant hastily picked up some rocks and threw them at the deceased without any intention to kill him. It is true that on direct examination the witness Walton swore that the rock he hit him with was "a good size," and that he did not hit him when he threw the first rock, yet, on cross-examination, the same witness testified that he did not know which rock struck the deceased. Under numerous decisions that have been cited, we do not think that testimony that a rock was "a good size" would necessarily show that it was a deadly weapon. Certainly it would not necessarily show that the rock which struck the defendant was such a weapon, if the testimony were susceptible of the construction that the witness did not know which of the rocks hit his father. Indeed, this witness testified: "I knew he threw a rock the first time, but I don't know what he threw the last time." The testimony as to the character of the rock, if it were a rock, with which the homicide was committed is quite as "vague, uncertain, and unsatisfactory" as was the testimony in *Jordan* v. *State,* supra. We are satisfied that the *evidence* in this case raises a doubt as to the intention to kill, and we hold that the court committed reversible error in failing, without request, to charge the law of involuntary manslaughter in the commission of an unlawful act. For this reason alone the judgment is reversed.

We see no merit in the contention that the venue was not proved, and, since the other questions raised by the special grounds of the motion for a new trial may not arise upon another trial of the case, we deem it unnecessary to consider them now. Of course, the general grounds of the motion will not be considered.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*