*J. A. Fort, J. L. Ellis, J. C. Graham,* and *G. C. Webb,* contra.

---

## BURNETT *v.* THE STATE.

1. Where one accused of murder had been convicted of that crime and the verdict was set aside upon his motion for a new trial, and upon the second trial under the same indictment counsel for the accused called attention of the jury to the fact that the defendant had been previously convicted and that the verdict had been set aside, it was not error for the court to mention this statement of the counsel to the jury, stating to them that the verdict had been set aside on account of an error made by the court in its instruction on the previous trial,

38

and cautioning them that they were not to concern themselves with any other trial, and that they were not to be influenced by anything that occurred as to the granting of a new trial.

2. It is only where a case is wholly dependent upon the law of circumstantial evidence that the trial judge is required to give the law of circumstantial evidence. It follows that where the indictment is supported by both circumstantial and direct evidence, it is not erroneous for the court to omit to charge the law of circumstantial evidence.

3. Failure of the court to give instructions to the jury on the subject of impeachment of witnesses, in the absence of a proper written request, is not error.

4. There is no evidence of mutual combat to be found in the record, upon which a charge upon the law of voluntary manslaughter as related to mutual combat could be predicated.

5. The court did not err in failing to charge upon the subject of involuntary manslaughter.

6. The written requests to charge which the court refused, in so far as they were legal and pertinent, were sufficiently covered by the charge which the court actually gave, as appears from a consideration of the charge embodied in the record.

No. 4653. June 24, 1925.

Murder. Before Judge Searcy. Pike superior court. December 4, 1924.

Hood Burnett was jointly indicted with Roscoe Holt and Son Wilson for the offense of murder, it being charged that Burnett and the other defendants unlawfully and with malice aforethought murdered R. K. O'Neal by shooting him with a gun. The contention of the State was that Roscoe Holt was the person who fired the shot that killed O'Neal. He had been tried and convicted and given a life sentence. The defendant in the present case had been put upon trial and convicted, and upon his motion he was granted a new trial. The verdict which he now seeks to set aside is the second verdict finding him guilty. The defendant, while pleading not guilty generally, admitted he was present at the time of the homicide, but denied that he aided or abetted the act done, or that he participated in the felonious design to take human life. All three of the parties indicted had been, on the evening of the 26th of December, the day of the homicide, to a dance and party at the home of one Ella Wilson. There had been some disturbance at the party, and there was some testimony to show that the deceased had fired a pistol two or three times. The party broke up early, at about 9 or 10 o'clock, going off in groups. According to the testimony of one of the witnesses, O'Neal, Bud Richardson, Shade

Richardson, and another man were in one party. Anthony Holt and Charlie Smith went off together, and the defendants jointly indicted caught up with Smith and Anthony Holt. They went on to a house referred to in the evidence as the Dewberry house. There was some disturbance at this latter house. The deceased went off, according to the testimony of some witnesses, along the road, but the evidence shows that he had left the road and got into a cotton-patch near the house of the Dewberrys. There was some evidence that the deceased was running.

Roscoe Holt, the person who fired the shot that killed the deceased, was sworn as a witness for the State, and testified in part as follows: "I was down there at Ella Wilson's to the party on December 26th, last year. I know R. K. O'Neal and know Hood Burnett. I was tried this morning and convicted and given a life sentence in connection with the killing of R. K. O'Neal. I shot R. K. O'Neal. Me and Hood and James Meadows were together going from Ella Wilson's house, and we struck up with Son Wilson, and we all went along together, except Son turned back and went along with us. Anthony Holt is my father's name. We overtook the other up at the Dewberry house, and I called my father. I saw Hood Burnett about that time. My father asked me what I wanted, and I told him to wait and I would tell him. Hood said, 'You had better wait,' or something of that kind. I don't know whether there were any words used like the word *scattering*. I would not attempt to quote the exact words used on that occasion. The crowd ran one way or the other. Hood went on the east side of the house. Hood had the gun then. He handed it to me. R. K. [the deceased] ran through the field like he was coming angry towards us, and stopped. Some of the boys said, 'Who is that?' I said, 'I don't know.' He said, 'Find out who it is.' He said, 'Shoot and see who it is.' He did not say shoot at him, he just said shoot, and I shot. I was not mad with R. K. at the time. When I was told to shoot, I just threw up the gun and shot. I did not know I shot at him. Yes, I stated that Hood did not have anything to do with this, to you (Mr. Dobbs) while I was in jail. Yes, I said he did not encourage me to shoot R. K. O'Neal; he said, 'Shoot and see who it is.' No, sir, Hood did not take the gun away and try to keep me from shooting. No, I did not jerk the gun away from Hood. He did not jerk the

gun from me. He had the gun behind the house. We all got behind the house and stopped. When I saw O'Neal he had been somewhere or he could have been further than he was. He was running angling. He did nothing when I shot. He had something in his hand, dark looking, and they said it was a pistol. I was not positive what it was. Hood didn't tell me to shoot him. He simply said to shoot, and that is all he said. He did not tell me to shoot when he gave me the gun. He handed me the gun when we walked behind the house. This man was running, and he stopped. Hood asked me what it was. I said, 'I don't know.' He said to shoot and see. I thought I would sprinkle him, and I shot and the shot killed him. I did not shoot to kill him. I did not know the gun would kill a man that far. He was about as far as from here to the jail (about 85 yards). He was standing still and it was dark where I shot, and I could not tell which way he was facing. It looked like he was facing me."

H. E. White, a witness for the State, testified in part as follows: "Judging from the wound he [O'Neal] must have been shot from the side. I had known R. K. O'Neal about three years, and am familiar with his track. I saw blood there on the ground where his body was. Judging from the tracks he was making at the place he fell, I was of the opinion that he was running. The strides he was making were about four feet."

James Meadows, a witness for the State, testified in part as follows: "I was at Ella Wilson's party that night. I heard some shots down at her house that night on the outside of the house. I went to the door and saw Hood and R. K. They were arguing about money. Hood said R. K. had taken a quarter from him. R. K. came nearer the door and shot up. I did not hear any words R. K. said then. It was about 10 or 12 o'clock. I had been at the party before that, and Hood and R. K. had been in the crowd out there. I don't know if Gus Moore was with them. I don't know whose pistol R. K. had. I was not out there. R. K. went up the road, and Bud Richardson with him, on his way home. I got him to go home. After he left he turned around and came back to Son Wilson's house, and Bud Richardson came back with him. He said, 'Who said back there they didn't like it?' and nobody said anything. Then he went back up the road, going home. I went up the road behind him with Hood

and Roscoe, and we met Son Wilson. I was behind Son and Roscoe, and Roscoe was calling his papa when we got up there. He said, 'Come here.' While he was calling his papa, Hood ran up and snatched the gun out of Roscoe's hand and said, 'Everybody scatter except that damned R. K.' R. K. O'Neal was the only R. K. there. They all scattered then. After Hood snatched the gun he ran back behind the house. That was after he said for everybody to scatter. Some of them started across the road, and he said, 'Don't anybody cross the road; if you do I will blow you down.' R. K. went down and crossed the field on the right side coming this way. Hood went on the other side from R. K. They did not cross the road when Hood said not to, until after that."

There was some evidence which it is unnecessary to report. A part of it corroborates the evidence of the first witness for the State. The jury returned a verdict of guilty. The defendant made a motion for a new trial on numerous grounds, which the court overruled, and the movant excepted.

*Dobbs & Barrett,* for plaintiff in error.

*George M. Napier, attorney-general, E. M. Owen, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

BECK, P. J. (After stating the foregoing facts.)

1. In the first ground of the motion for a new trial error is assigned upon the following extract from the charge of the court: "I call your attention to the point mentioned by the counsel of the defendant to the jury, that this defendant has been previously tried, and the record now appears on the indictment. He said that the verdict had been set aside. I will state that I granted the defendant a new trial on account of an error I made in instructing the jury. You are not concerned with any other trial, and you are not to be influenced by anything that occurred as to the granting of the new trial." In view of the fact that counsel for the defendant in his argument to the jury called attention to the judgment setting aside the first verdict of guilty, and that the jury might have been led to infer from this statement of counsel that the verdict had been set aside because the evidence did not authorize it, there was nothing improper in the court's stating to the jury that the former verdict had been set aside and a new trial granted on account of an error in the court's charge to the jury;

especially as he instructed the jury, in immediate connection with that statement, that they were "not concerned with any other trial, and were not to be influenced by anything that occurred as to the granting of the new trial." This charge was not open to the exception that "it is argumentative and unduly influenced the jury to the theory that the evidence was amply sufficient to support the verdict rendered in that case, and that the verdict was right and would have met the approval of the judge except for the error in the charge to the jury."

2. Error is assigned upon the failure of the court "to charge on circumstantial evidence, movant contending that all the evidence in any way connecting the defendant as an aider and abettor was circumstantial, though he admitted his presence." We can not agree to the contention that all of the evidence tending to show that the defendant aided and abetted in the commission of the crime was circumstantial. The man who fired the fatal shot admitted the shooting, and testified in part: "The crowd ran one way or the other. Hood [the defendant] went on the east side of the house. He had the gun then. He handed it to me. R. K. [O'Neal, the deceased] ran through the field like he was coming angry towards us, and stopped. Some of the boys said, 'Who is that?' I said, 'I don't know.' He said, 'Find out who it is.' He said, 'Shoot and see who it is.' . . Hood didn't tell me to shoot him. He simply said to shoot, and that is all he said. He did not tell me to shoot when he gave me the gun. He handed me the gun when he walked behind the house. This man was running, and he stopped. Hood asked me what it was. I said, 'I don't know.' He said, 'Shoot and see.' I thought I would sprinkle him, and I shot, and the shot killed him. I did not shoot to kill. I did not know the gun would kill a man that far. He was about 85 yards off. He was standing still, and it was dark where I shot, and I could not tell which way he was facing. It looked like he was facing me." Evidently, from this testimony, the witness who committed the act of shooting the deceased knew that it was a man out in the field. While he testified that it was dark, it is clear from his testimony that he did not mean it was so absolutely dark that he could not perceive any object; for he testified that the deceased ran through the field towards him or towards the group, as if he was angry. He did testify that he

could not tell which way he was facing, but he added, "It looked like he was facing me." In view of these facts and this testimony, the court did not err in failing to charge upon the subject of circumstantial evidence. "It is only where a case is wholly dependent upon the law of circumstantial evidence that the trial judge is required to give the law of circumstantial evidence. It follows that where the indictment is supported by both circumstantial and direct evidence, it is not erroneous for the court to omit a charge upon the law of circumstantial evidence." *Nobles* v. *State,* 127 *Ga.* 212 (56 S. E. 125).

3. Error is assigned on the failure of the court to charge on the subject of impeachment of witnesses. There is no merit in this exception, as it does not appear that there was any written request for a charge upon this subject. We do not know of any other principle of law that has been so frequently ruled as this. See 11 Enc. Dig. Ga. R. 681.

4. The ruling made in the fourth headnote requires no elaboration.

5. Movant excepts to the failure of the court to charge upon the subject of involuntary manslaughter in the commission of an unlawful act, and also in the commission of a lawful act without due caution and circumspection. The failure of the court to charge upon this subject was not error. Roscoe Holt, who had been convicted as principal in the first degree, and who was introduced as a witness for the State, shows by his testimony that the crime which he committed by shooting and killing O'Neal was murder. Read, in this connection, the testimony of Holt which we have quoted above. Consider especially the following brief restatement of a part of that testimony: "Hood had the gun then. He handed it to me. R. K. [meaning O'Neal, the deceased] ran through the field like he was coming angry towards us, and stopped. Some of the boys said, 'Who is that?' I said, 'I don't know.' He [referring to the defendant in the present case] said, 'Find out who it is.' He said, 'Shoot and see who it is.' . . I thought I would sprinkle him, and I shot, and the shot killed him. I did not shoot to kill. Did not know the gun would kill a man that far." But it did kill the man who was shot at. And the killing was not reduced to a lower grade of homicide merely because the man who fired the gun and the man who aided and

abetted the act might have thought that the gun "would not kill a man that far." *Studstill* v. *State,* 7 *Ga.* 2; *Stovall* v. *State,* 106 *Ga.* 443 (32 S. E. 586).

Evidently, though it was dark, Holt knew that the object out in the field was a man. Hood—this defendant—told him to shoot. Holt's testimony shows that when he shot and killed O'Neal he committed murder. Hood, this defendant, had handed him the gun and told him to shoot. If Holt was guilty of murder under these circumstances, Hood, aiding, abetting, and counseling the act done, was guilty as principal in the second degree of the same crime. This defendant made a statement which is in the record. He narrates the circumstances of the killing, but does not refer to the statement of the witness Holt and another witness wherein they swore that he said, "shoot." His entire description of what happened at Dewberry's house, where the killing occurred after the several groups of persons had arrived there after they left Ella Wilson's house, is vague and obscure. Here is his narrative of what occurred as they left or were leaving the house of Ella Wilson and going to the Dewberry house: "Gus Moore walked behind him when he walked off, but I stayed behind there at the house. When R. K. got off a piece he turned around and came back and said, 'G— d—n you, somebody said you was killed.' They then went off up the road and commenced shooting over on the other side of the branch. They shot twenty-five times. I slacked up and did not go in that crowd. On the way, before I caught up with the crowd, Roscoe and James Meadows passed me with a shotgun and asked me who it was shooting up there. I said it was the crowd that had passed on over there, and for them not to go up there and start anything. Roscoe said he was not going to start anything but to stop something. When he got near the crowd he called out for his papa to come to him. When he said that, the folks broke and run, some went to the left and some went to the right. I told them not to go toward the house or cross that way, they might get shot. Roscoe and James Meadows were as far from me as the middle of the court-house. I thought they had shot some one up there. There is a little round house out to the side of the road, and I turned and ran out towards it. I made two steps from the road and heard the gun fire over back of the house. I did not see the gun fire. I stopped right then, and James and

Roscoe came back towards me. I heard James say, 'I saw something fall,' and I walked back in the road when I heard James say, 'I saw somebody fall.' General Holt told me I had better not go out there. Somebody may be in the grass and bust you open. James Meadows said he saw somebody fall, and let's go and see who it was. I went and got as close as to that post, and saw somebody out in the cotton-patch. I was standing on a terrace and saw the body. I said if they would go I would go with them. James, General, and Bud walked out to where he was. I did not go. They said it was R. K. General Holt got his pistol, and James Meadows got it from him; that was the way it was. General Holt managed about the pistol. He gave it to Bud and then he got it back. When they got up there they asked who killed R. K.; who shot the gun. James said, 'Roscoe, you know you did it.' Roscoe said, 'Well, I have got to go,' and he got back in the road. His papa said, 'I told you a week ago that you were going to kill somebody or somebody kill you.' Roscoe said, 'Don't talk that way; I have got to go,' and asked if he had any money. He said, 'Yes, I have got two dollars,' and he gave it to him. That's all I know about it. I had nothing to do with it at all. General said, 'Let's move him.' I said, 'I don't believe we can move him,' for us to go and see Mr. Bush. We asked him what about moving the man that got killed. He said he did not know, and I did not know whether we could move him or not. They went to town to see Mr. Owens, but I did not go any further. I said, 'I will stay till you come back.'"

If Holt was guilty of murder in killing O'Neal (and it is clear that he was from the evidence), then this defendant was guilty in the second degree, if he aided, and abetted the act. And his own statement does not suggest guilt of a lower grade of homicide. In his statement he says, it will be noticed, after vaguely and obscurely narrating the events, as it appears from a quotation from his statement, "That's all I know about it. I had nothing to do with it at all." He denies his guilt of any crime. But the jury found his positive statement that he was not guilty to be untrue.

6. Error is also assigned upon the failure of the court to give in charge to the jury certain requested instructions. These are as follows: (a) "A principal in the second degree is a person

[who], though he does not give the mortal wound, is present at the time it is given, and is aiding and abetting the principal in the first degree to cómmit the specific crime charged, and actually participates in the felonious design of the slayer to take human life." (b) "In order to constitute any one a principal in the second degree, he must not only be present at the time, but must also aid and abet the principal in the first degree in the commission of the alleged crime. And it takes all three of these elements: that is, presence, aiding, and abetting." (c) "In criminal law, the word *aid* means help or assist in the commission of the unlawful act." (d) "The word *abet* means to encourage or set another on to commit an unlawful act. Thus to abet another to commit a crime means to command, procure, or counsel him to do it. And it takes all the elements; that is, presence, aiding, abetting, or entering into the felonious design of the principal in the first degree, and the absence of either element is sufficient to free the person charged as principal in the second degree from guilt of the crime charged." (e) "Though one be present at the time of the commission of the crime and mentally consents to it or approves it, yet if this consent or approval is unknown to the principal in the first degree, and he does not enter into the felonious design, he is not guilty as a principal in either the first or second degree." (f) "Where one, jointly indicted for murder with others, is on trial, if there is no evidence of conspiracy, and the person did not inflict the mortal wound, a verdict of guilty should not be returned, unless the State shows beyond a reasonable doubt that there was such a conspiracy between the person on trial and the actual perpetrator of the crime."

The court did not err in refusing these requests. In so far as they state the law applicable to the issues made by the evidence, they were sufficiently covered in the court's charge. The court actually charged upon the subject dealt with in these requests, as follows: "The principal in the second degree is one who was present aiding and abetting the act to be done; he would be a principal in the second degree. In this case he would be one, if there was one, who was present aiding and abetting the principal in the first degree to commit the offense; it is one who aids and abets within the meaning of the law. If the crime is committed, it is necessary that such person be not only present at the time the

crime is committed, but he participated in some way in the commission of the crime. He must have aided and abetted in the commission of the crime. It is not sufficient that he merely consented to it. It is not sufficient that he approved of it. He must do some act, in some way, in the commission of the crime. He must abet, encourage its commission, procure its commission, counsel or advise its commission. Whether or not, if a crime was committed by any one on this occasion, within the meaning of this law the accused aided and abetted the commission of the crime, are all questions of fact for you to determine. You must see whether the facts authorize you to say that he was present at the time, and that he participated in it—encouraged it, counseled or commanded it, or procured its commission. If you find he did, his conviction is authorized. If you can not say he did, if you are unable to say he did or not, or if you have a reasonable doubt of it, his conviction would not be authorized."

The evidence authorized the verdict.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting, and Gilbert, J., absent for providential cause.*

RUSSELL, C. J., dissenting. I am in grave doubt but that the learned trial judge should have given in charge to the jury the law of involuntary manslaughter as applicable to the evidence of the leading witness for the State himself. I recognize fully that every person is presumed to intend the legitimate consequences of his own act, and I am in full accord with the numerous decisions of this court in which it has been held that murder will not be reduced to involuntary manslaughter, where death has resulted, under the pretense that the intention of the assailant was merely to wound. In this case, however, the State's witness testifies that he was eighty-five yards from the deceased at the time that he shot. The weapon was a shotgun. His intention was not to wound or cripple, but merely to sprinkle. Without going into the details of the testimony it would seem that it was a jury question; that the intention of the accused was a jury question not solvable by the court.

I dissent from the ruling of the court as set forth in the first division of the opinion. It seems from the record that counsel for the defendant in their argument had referred to a previous trial, which was highly improper, and would have authorized interference

on the part of the court. In referring to this the court said: "I call your attention to the point mentioned by counsel for the defendant to the jury, that this defendant has been previously tried, and the record now appears on the indictment. He said the verdict had been set aside. I will state that I granted the defendant a new trial on account of an error I made in instructing the jury." There is a powerful negative pregnant, in this statement from the bench to an intelligent jury in the box, that it was solely on account of an error which the court confessed he had made in the instructions that a new trial had been accorded the defendant at all. This statement, which I assume to be error, may not have been material in the present case; but I am unwilling to commit myself to such practice generally and for all cases. I care not that the court concluded, "You are not concerned by any other trial, and you are not to be influenced by anything that occurred as to the granting of a new trial." The human mind is so constituted that it is indeed very difficult for it to discriminate between cautions which may appear to the jury to be merely perfunctory and the main point in the case, which is the consideration of the evidence. I think that it is at least likely that the jury were influenced by what would necessarily appear to be the opinion of the judge as to the evidence. If more had been said, perhaps the error might have been amended.

In my opinion the statement of a trial judge, in the presence and hearing of a jury passing upon the case of one who is for the second time being tried for a criminal offense, where a new trial had been granted the prisoner by the trial judge, which embodied the following instruction: "I call your attention to the point mentioned by the counsel for the defendant to the jury, that this defendant has been previously tried, and the record now appears on the indictment. He said that the verdict had been set aside. I will state that I granted the defendant a new trial on account of an error I made in instructing the jury," would naturally tend to impress the jury with the conclusion that the judge was perfectly satisfied with the evidence of the guilt of the accused; that he granted the new trial only because of what he conceived to be his error in the instructions upon the former trial. The remark, thus construed, as I am led by my experience to believe, would be the construction most naturally placed upon it by the jury. This in-

struction to the jury, in my opinion, amounted to such an expression as to the credibility, weight, and sufficiency of the evidence as is violative of the provisions of section 4863 of the Code of 1910. The provisions of this section are mandatory in the requirement that a new trial shall be granted; and therefore, regardless of any of the other assignments of error, I am compelled to dissent from the judgment of my associates. It is true that the judge added to the instruction already quoted a caution as follows: "You are not concerned with any other trial, and you are not to be influenced by anything that occurred as to the granting of the new trial," but it is very plain to me that this amounted to nothing more than a statement that the jury were not to be influenced by the court's opinion of the evidence or the reasons that influenced him in granting a new trial. The virus prohibited by law had been injected. The jurors could but infer that the evidence was satisfactory and sufficient. This intimation, no doubt unintentional, the court was not permitted to make even in a whisper, and the caution that they should not be influenced in the respect referred to by the court was a salve insufficient to cure the wound inflicted upon the defendant in giving superadded weight to the testimony adverse to his defense.