DECIDED FEBRUARY 16, 1939.

27257. GREENWAY v. THE STATE.

DECIDED FEBRUARY 16, 1939.

*Fred L. Brewer,* for plaintiff in error.
*Robert McMillan, solicitor-general,* contra.

MacIntyre, J. Worth Greenway and his brother, Woodward Greenway, were jointly indicted for the murder of Mart Hicks. Worth Greenway was convicted of voluntary manslaughter, and to the overruling of his motion for new trial as amended he excepted.

Joe Hicks, son of the deceased and the only witness for the State who saw the transaction in question, testified on direct examination that he, his sister, and her husband, Woodward Greenway, were sitting in the yard of Woodward Greenway cracking walnuts, and "Worth [the defendant] come up in the yard and was standing there, and daddy come down the road and asked Worth about helping him gather corn, and Worth had a knife in his hand and he jumped off the bank down into the road and went to fighting father, and I run in the house and got the gun and come back out there and Woodward Greenway hit me with a rock and took the gun away from me and run down the road, and when I got to where I could know anything I looked up the road and saw Woodward drawing the gun over my father; father was lying on the ground at that time. Worth had a knife in his hand when he jumped on my father, and father didn't have anything. When they first started I went in the house to get the gun to protect my father, and when I come out Woodward hit me with a rock and took the gun away from me; he knocked me unconscious, and when I got to where I knew anything I looked and saw Woodward drawing the gun over him like he had hit him with the gun, and then I went down there and got my father and took him to the house."

On cross-examination Joe Hicks, testified: "Me and Woodrow [Woodward Greenway] and my sister were cracking walunts, and Worth came up and was standing there eating walnuts with his knife and had his knife in his hand; he didn't take it out after father came down there; he already had it out in his hand. I saw Worth hit my father two or three times, I don't know what with. I don't know which hand he hit him with; when he jumped off the bank I ran in the house; I don't know which hand he had the knife in. I didn't see father make an effort to fight Worth at all. I got the gun because I was scared, and to protect my father; I guess I would have shot Worth if I could have got out there; anybody will do anything when they are scared. When Worth went to hitting him I ran in the house for the gun. I was unconscious from the time I was hit with the rock until I came to, and then I saw

Woodrow [Woodward Greenway] drawing the gun from over father. I never saw a thing in father's hand during the fight, no rock or knife or anything."

Dr. S. A. West testified that in his opinion the wound from which the deceased died was not made with a knife, and that the fatal wound on the deceased's skull could have been made with a rock. C. E. Crawford, sheriff and witness for the State, testified: "I handed the solicitor-general this rock. I got it in front of Woodrow [Woodward] Greenway's house. That is the place where the trouble took place. I got this rock the morning this thing was done." Woodward Greenway, witness for the defendant, testified that he, his wife, his brother-in-law, and the witness Joe Hicks, were sitting in his yard picking out walnuts, that Worth Greenway was using his knife for the purpose of picking out the nuts, and that while they were thus engaged, the deceased, the father-in-law of the witness, came up and there engaged in a conversation with the defendant, and finally the deceased called the defendant a ——, —— liar, and the defendant said " 'You are another,' and then they went over the bank. Mr. Hicks didn't have anything in his hand until the racket started. Worth had his knife in his hand picking out walnuts, and as soon as the racket started Worth shut it up and put it in his pocket. When the racket started they were both in the yard together and went over the bank together in the road. Joe come out the door to the edge of the porch and says he was going to kill the [s. o. b.], and I took the gun away from him, and then I went up there where Mr. Hicks and Worth were, and Mr. Hicks had a knife in one hand and a rock in his left hand. . . I saw that the old man's skull was busted afterward."

The defendant's statement was in part as follows: That the deceased called him a damn liar and that he (the deceased) thereupon said, " 'Being as you feel that way about it, maybe you told me a damn lie,' and at that he went to pulling his knife out of his pocket and started to open it and had it in his hand and started toward me, and me in the corner there, and whenever he started to open his knife and started toward me I grabbed him and he cut me on the hand before I got hold of him. I grabbed both of his hands, and whenever he slung loose and tried to get loose I fell over off the bank, and he fell across the road and fell in the ditch, and when he hit the bank he come back and had a rock in his other hand and still

had his knife, and whenever he come back on to me before I got up I told him not to come on me no further, and I tried to get up and turned around so I could get my leg loose, and I got up and he was over me and I picked up a rock and hit him right in the left of the head."

1. The mere fact that death resulted from the use of a rock does not necessarily show affirmatively that it was a weapon likely to produce death and that the killing was murder. *McDonald* v. *State,* 23 *Ga. App.* 58, 61 (97 S. E. 448). In the instant case, the evidence did not demand a finding that the rock was a deadly weapon, that is, that it was such a weapon as would ordinarily produce death, and that when employed in the manner in which it was used in this case the usual and natural consequences would be to produce death, and that the blow was struck with the intent to kill. *Hilburn* v. *State,* 57 *Ga. App.* 854 (197 S. E. 73). On the other hand, we think the evidence distinctly raised the question whether or not the rock, when used in the manner in which it was used, would ordinarily be calculated to produce death, and whether or not the blow was struck with an intent to kill.

We are of the opinion that the evidence authorized (but did not require) the jury to find that there existed such circumstances that, even though the blow was not justified, the accused was guilty only of the offense of involuntary manslaughter. *Dorsey* v. *State,* 126 *Ga.* 633, 634 (55 S. E. 479). We are aware of the rule that "'Where one voluntarily fires a loaded pistol at another, without excuse and not under circumstances of justification, and kills the person at whom he shot, the law will hold the slayer responsible for the consequences of his act. It conclusively presumes malice on the part of the slayer; and the grade of the homicide, so committed, will not be reduced to involuntary manslaughter, even if the intent of the slayer, under such circumstances, was to wound or cripple the deceased, and not to kill.' *Stovall* v. *State,* 106 *Ga.* 443 (3) (32 S. E. 586). See also *Smith* v. *State,* 73 *Ga.* 79 (3); *Conley* v. *State,* 21 *Ga. App.* 134 (5) (94 S. E. 261)." *Harris* v. *State,* 55 *Ga. App.* 189, 191 (189 S. E. 680). Thus, when a deadly weapon was used to accomplish the killing, and it was used in the usual and natural manner in which such weapon would produce that result, as shooting the deceased with a pistol, a presumption of an intent to kill would be authorized; but if the same pistol

was used by striking the deceased upon the body (and not shooting him), the evidence might raise the question that the defendant used the pistol (a deadly weapon) in a manner not calculated to produce death, in which case the question of intent to kill would be one of fact for the jury. Indeed, the only evidence referring to the character of the rock was that the sheriff, while he was testifying, exhibited a rock which he found at or near the spot where the struggle occurred. The record does not disclose that it was introduced in evidence. The evidence is silent as to the size, weight, and character of the rock. *Chapman* v. *State,* 120 *Ga.* 855, 857 (48 S. E. 350.) ; *Anderson* v. *State,* 130 *Ga.* 364 (60 S. E. 863). One phase of the evidence tends to show that the defendant did not use ·or attempt to use his knife which he had open just before the beginning of the fight, but that he closed it and put it in his pocket upon engaging in the struggle, and that thereafter he hastily picked up a rock lying nearby and quickly struck the deceased, from which blow death resulted. There is no evidence that the defendant struck the deceased more than one blow with this rock. Although the defendant might not have been justified in striking the deceased with the rock, yet, if the defendant hastily picked up the rock and quickly struck the deceased with no intent to kill (as for instance, merely intending to commit an assault and battery upon him), and if the evidence failed to disclose that the rock was. a deadly weapon, or was used in such a manner as would ordinarily have produced death, the defendant would be guilty of involuntary manslaughter. *Smith* v. *State,* 50 *Ga.* *App.* 105, 108 (177 S. E. 76). Under one phase of the evidence in the instant case the law of involuntary manslaughter in the commission of an unlawful act was involved, and it was error for the judge to fail to instruct the jury on this subject.

2. The other questions raised by the special grounds of the motion for new trial may not arise on another trial of the case, and we deem it unnecessary to consider them. Of course the general grounds of the motion will not be considered.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*