31557. RANDOLPH *v.* THE STATE.

DECIDED MAY 21, 1947. REHEARING DENIED JUNE 5, 1947.

260

*Hamilton Kimzey, Irwin R. Kimzey, Rache Bell,* for plaintiff in error.

*Hope D. Stark, Solicitor-General, Charles C. Piltard,* contra.

GARDNER, J. ■ In our opinion it would be supererogation for us to here go into an analysis of the evidence to show that the verdict of voluntary manslaughter is supported by the evidence. This is true, since we have set out the evidence in detail. Without doubt, under the evidence, the jury were authorized to find that the defendant, because of passion aroused on account of the alleged attack of the deceased on his mother, killed his father. A cursory reading of the evidence will reveal this fact. The evidence also would have supported a verdict for murder. Indeed the evidence smacks strongly of a conspiracy to take the life of the deceased without legal justification. Of course we do not mean to say that under the defendant's contentions a verdict of not guilty would not have been authorized on account of self-defense. We must judge the accused as standing in the shoes of his mother. The court submitted all of these phases. The jury were within their province to return a verdict for voluntary manslaughter. The court did not err in overruling the motion for a new trial on the ground that the evidence does not support the verdict for voluntary manslaughter.

■ There are five special grounds in the motion. Special grounds 1, 2, 3, and 4 assign error on the ground that the court erred in failing to charge, without a request, involuntary manslaughter in the commission of an unlawful act and in the commission of a lawful act without due caution and circumspection. These grounds are argued together by counsel, and we will discuss them together. They are based on the defendant's statement

and the evidence of his brother and mother to the effect that the brother and mother testified in corroboration of the defendant's statement that the defendant shot the deceased not with any intention to kill him but with the intention of shooting a gun out of the hands of the deceased, which gun was at the time being pointed at the defendant's mother, to prevent the deceased from killing the defendant's mother. The defendant, in his statement, said that he shot his father for the purpose of disarming him to save the life of the defendant's mother. The defendant's brother and mother testified that the defendant shot the father with this intention and not with any intention to kill. Counsel for the defendant in his argument before the court here very frankly stated that the testimony of the brother as to what intention the defendant had when he fired the fatal shot was not competent testimony. But he further contended that since the evidence was in without objections, the court was bound to charge on involuntary manslaughter. Counsel further inferentially admitted that the defendant's statement only to the effect that the shot was fired for the purpose of disarming the deceased, the court would not have been required to charge on involuntary manslaughter without a written request. We do not think the testimony of the brother and mother in this respect had any probative value. This is true for the reason that they could not tell what was in the defendant's mind when he shot the deceased, and the law could not permit them to say. Be this as it may, we will deal squarely with the question as to whether under all the facts and circumstances and the defendant's statement the court erred, with or without a written request, in failing to charge the ·law applicable to involuntary manslaughter in either of its phases. Counsel for the defendant cite a number of cases upon which they rely for a reversal based on these special grounds. Those cases are: *Cain* v. *State,* 39 *Ga. App.* 128 (2) (146 S. E. 340); *Jackson* v. *State,* 43 *Ga. App.* 468 (159 S. E. 293); *Thomas* v. *State,* 47 *Ga. App.* 237 (3) (170 S. E. 303); *Smith* v. *State,* 50 *Ga. App.* 105 (177 S. E. 76); *Greenway* v. *State,* 59 *Ga. App.* 461 (1 S. E. 2d, 217); *Kelly* v. *State,* 145 *Ga.* 210 (3) (88 S. E. 822). We have read each one of these cases very carefully. Their facts differentiate them from the facts of the instant case. All but two of them involve homicides where no weapon deadly per se was used. Two of them,

*Jackson* v. *State,* and *Cain* v. *State,* supra, involved a gun, but the guns in those two cases were not, as here, being used in the usual and ordinary manner to kill. In the *Jackson* case there was a tussling over a gun; in the *Cain* case the deceased was either struck with a gun or hit his head on certain snags while tussling over a gun. In the instant case the defendant used the gun in the usual and natural manner in which a gun is used to kill, and did kill. In such a situation the law presumes that the defendant intended the natural consequences of the result of his act,—that is, that he shot with the intention to kill, and he will not be heard to say that he did not so intend. And we can not very well comprehend how the law could afford any degree of protection for human life should it provide otherwise. When a homicide is neither justifiable nor malicious it is manslaughter,—if intentional it is voluntary manslaughter. Some of the cases on this phase go to the extent of not only holding that the intention will be presumed, but that it will be conclusively presumed where a deadly weapon is used in its usual and natural manner for killing, and death results. In *Kinsey* v. *State,* 24 *Ga. App.* 342 (100 S. E. 770), this court said: "'When one voluntarily shoots at another and the shot kills, the homicide can not be involuntary.' *Smith* v. *State,* 73 *Ga.* 79 (3)." There are many other cases which militate against the defendant's contentions. We will call attention to some of them, as follows: *Hanvey* v. *State,* 68 *Ga.* 612; *Chelsey* v. *State,* 121 *Ga.* 340 (49 S. E. 258); *Napper* v. *State,* 123 *Ga.* 571 (51 S. E. 592); *Nolly* v. *State,* 124 *Ga.* 10 (52 S. E. 19); *McLeod* v. *State,* 128 *Ga.* 17 (57 S. E. 83); *Scott* v. *State,* 132 *Ga.* 357 (64 S. E. 272); *Norton* v. *State,* 137 *Ga.* 843 (74 S. E. 759); *Cullins* v. *State,* 148 *Ga.* 17 (95 S. E. 675); *Burnett* v. *State,* 160 *Ga.* 593 (128 S. E. 796); *Wright* v. *State,* 168 *Ga.* 690 (148 S. E. 731); *Griffin* v. *State,* 183 *Ga.* 775 (190 S. E. 2); *Gaskin* v. *State,* 11 *Ga. App.* 11 (74 S. E. 554); *Hart* v. *State,* 14 *Ga. App.* 364 (80 S. E. 909); *Harris* v. *State,* 55 *Ga. App.* 189 (189 S. E. 680); *Jones* v. *State,* 58 *Ga. App.* 374 (198 S. E. 566); *Greenway* v. *State,* 59 *Ga. App.* 461 (1 S. E. 2d, 217). There is no error in the contentions of counsel for the defendant as contained in special grounds 1, 2, 3, and 4.

■ Special ground 5 contends for a reversal because the verdict returned by the jury was illegal and contrary to law in that it did

not prescribe a minimum and maximum within the minimum and maximum for voluntary manslaughter as required by the principles of the Code, § 27-2502. It is further contended that the verdict is contrary to the charge of the court. The court charged the jury as alleged in this ground as follows: "and you may then take up and determine whether or not the defendant is guilty of the lesser offense of voluntary manslaughter, and if you convict him of that offense the form of your verdict would be: 'We, the jury, find the defendant guilty of voluntary manslaughter.' It would then be your duty to fix the punishment the defendant would receive within the limits prescribed by law, these limits being from one to twenty years, and you would add to that verdict of 'We, the jury find the defendant guilty of voluntary manslaughter' the following 'and we fix his punishment at minimum term so many years which must not be less than one year, maximum term so many years which must not be greater than 20 years.' You may, if you see fit, fix the minimum and maximum terms the same number of years. . ."

The verdict returned by the jury is as follows: "We, the jury, find the defendant John Randolph, col. guilty of voluntary manslaughter. This 14th day of November. 7-10 years. 1946 [Signed] M. E. Chandler, Foreman."

The court sentenced the defendant to serve not less than seven years, nor more than ten years in the penitentiary.

Counsel cite, in support of this contention, the case of *Mitchell v. State,* 34 *Ga. App.* 505 (130 S. E. 355). That verdict was to the effect: "We, the jury, find the defendant guilty and recommend him to the mercy of the court." The appellate court held that that verdict was error for the court to receive it and sentence the defendant to a minimum of five years and a maximum of ten years. Under the charge of the court, considered in connection with the verdict returned in the instant case, it is clearly discerned that the jury intended the sentence to mean that the defendant was to be sentenced to a minimum of seven and a maximum of ten years. The defendant cites also the case of *Camp* v. *State,* 187 *Ga.* 76 (200 S. E. 126). That case is to the same effect as the case of *Mitchell* v. *State,* supra. Counsel also cite the case of *Burns* v. *State,* 191 *Ga.* 60 (11 S. E. 2d, 350). A casual reading of that case shows that it is not applicable to the facts in the instant case. This ground is without merit.

The court did not err in overruling the motion for a new trial for any of the reasons assigned.

*Judgment affirmed. Sulton, C. J., MacIntyre, P. J., and Parker, J., concur. Felton, J., concurs in the judgment. Townsend, J., dissents.*

TOWNSEND, J., dissenting. The State relies in this case on the evidence of the condition of the deceased after he was shot, and the testimony of the witnesses, William Randolph, Rembert Casey, Farris Brewer, and Verner Brewer. William Randolph testified in substance: that he lived in Birmingham; that he was a first cousin of Russell Randolph; that he visited Russell Randolph on August 29, 1946, and went to the New Salem Church with Russell Randolph and his wife and some neighbors that night, and returned home ten minutes before twelve o'clock; that he was seventy-five years of age and did not know how old Russell Randolph was; that when he came back from church he procured a flashlight and went outdoors; that he came back in less than ten minutes, and Russell and his wife were talking very loudly; that he asked, "What's the trouble?" and Russell came to the door carrying a single-barrel shotgun and said to the witness, "Go on in the room and lay down;" that he went in and lay down and carried the flashlight with him, and in a few minutes the boy came in there and slammed the door going out, without saying anything; that in a few minutes he heard a gun fire, after which everything was quiet for about three minutes, and then he heard a woman crying out on the porch; that he got up, dressed and started to leave, and the woman said, as he was leaving, "Where are you going, Cousin William?" The witness replied: "I am leaving here. I don't stay at no house where there is a fuss." She summoned the little boy, gave him the light, and instructed him to accompany the witness to the home of a neighbor. About forty-five minutes later the sheriff came there, arrested the witness, and brought him back to the home of Russell Randolph. He and the sheriff went into the room where Russell Randolph had been shot, and he was lying across the bed with the right side of his head almost shot off. The witness does not recall any statement made by the defendant. The witness did not know which of the boys came into the room in which the witness had gone to bed before the shooting. While he was in there he lit a lamp in that room. On cross-examination and re-

direct examination, the witness substantially reiterated the foregoing testimony.

Rembert Casey testified in substance: That he lived on the same farm where Russell Randolph lived on August 29, 1946. On that night he took Russell and his wife, and the old man, his cousin, to church at New Salem, above Jefferson, in his car and got back to Russell's house about twelve o'clock. The defendant was not there, and he saw him later that night. The home of Russell Randolph was in Banks County. After the witness had gone to his home, the defendant came and asked him to take him to Commerce. He (the defendant) and his daddy had a little trouble and he shot his daddy in the head, and didn't know whether he was dead or not. The witness returned to the home of Russell Randolph expecting to take him to the doctor and found Russell lying there in the bed, dead. The defendant gave the witness no reason for shooting his father. He returned to his home with the witness, but didn't get out of the car. He took the defendant to town to see about an inquest. He talked with a Mr. Hosch and another fellow, who, being informed by the witness that there were eyewitnesses to the shooting, said that no inquest was necessary. The witness returned to the Randolph home and spent the night there. While there, the defendant's mother told the sheriff about how it happened. The defendant also told the sheriff, but the witness couldn't remember all that the defendant told him. He does remember that he said he was taking up for his mother and that the deceased had told his mother to leave or something like that. Farris Brewer, the sheriff of Banks County, testified that on the 29th of August, 1946, he was called to the home of Russell Randolph. When he got there, he found a dead man in the bed, dressed in his night clothes, his head was practically blown off. The defendant had very little to say. He did not deny it. His mother was present; she stated that everything went off all right until they got back from church. He was "fixing" to make her leave. The defendant was not there. Later he came, and asked her what was the matter, and she told him; he went then and got the gun and shot the deceased. The witness said that John had little to say. He did say his father "was wanting" to kill his mother; that he had once had trouble with his father when the latter tried to dig him to death with a hoe, and his moth-

er got between them. The defendant admitted the shooting and pointed out the gun that he used. On cross-examination, the sheriff testified to the statement the defendant made, that it was in defense of his mother; that the mother said she was out on the porch when the defendant came in that night, and she related to him the trouble which she had with the deceased. On redirect examination, the sheriff stated that the mother did not tell him that Russell was sitting up in the bed with the gun pointed at her when the defendant shot him. Verner Brewer, deputy sheriff and son of the sheriff, testified substantially to the same facts as those testified by his father. In addition he exhibited the gun, pointed out as being the one doing the killing, and testified: That the defendant's mother stated that the single-barrel gun was over the doorway and the double-barrel gun was next to the bed. The shell was either on the floor or on the table. It was picked up by Russell Jr. and given to them. The double-barrel gun was not loaded. The statements made by the defendant's mother were in his presence. He related the statements substantially as his father did, adding that she said that she was on the porch crying when the defendant came home and asked her about the trouble.

The defendant's statement, corroborated by the only eyewitnesses to the shooting, Caroline Randolph, mother of the defendant, and Russell Randolph Jr., 17-year-old brother of the defendant, substantially presented a statement of fact as follows: On August 29, William Randolph, first cousin of the deceased, came to the Randolph home in Banks County and kissed Caroline Randolph, wife of the deceased in the presence of the deceased, and after they went to church and upon their return Russell Randolph commenced a quarrel about the kissing episode. He ordered her to leave the house. She asked him to let her stay until morning. He said that in the morning he was going to kill her. She went out on the porch and was sitting there crying, when the defendant and Russell Jr. came home. The defendant asked his mother what was the trouble, and she said that she told the defendant that her husband was quarreling with her about Willie kissing her and that he had a gun and was going to kill her if she didn't leave. That the defendant told her to come on and let's go in; that he is not going to hurt you; that they went in and the defendant said to the deceased, "What's the matter?" That the deceased said,

"You'll see in the morning;" that he thereupon pointed a gun at her. She "hollowed" and screamed. The deceased said, "I told you not to come back in here. I told you, if you did I was going to kill you." That while the deceased was thus pointing a shotgun at the defendant's mother and threatening to kill her, the defendant reached to the rack over the doorway in which he, the defendant, was standing, got down another shotgun and shot the deceased in the head, killing him. The defendant stated that he intended to shoot the weapon out of his father's hands. This conclusion was also testified to by the defendant's mother and brother, obviously they could not know his intention.

An examination of the facts in this case discloses that the State relies upon the manner in which the deceased was shot, the defendant's admission that he shot him, other admissions on the part of the defendant, and statements by the mother of the defendant made in defendant's presence.

There is no material conflict in the State's evidence and that offered by the defendant and the defendant's statement. In fact a great deal of the State's evidence corroborates that of the defendant and his statement. For instance, the testimony of William Randolph that he saw the deceased with a gun in his hand before the defendant got home while he was quarreling with his wife, corroborates the testimony of Caroline Randolph that the deceased had the gun before the defendant came home.

While neither the defendant nor his mother told the sheriff as much as they told the jury, they told him nothing that conflicted with what they told the jury.

It is true that the defendant told the sheriff little of the occurrence, yet he did tell the sheriff that the defendant's "father was wanting to kill her" (his mother), and he "was taking up for his mother" and "it was in defense of his mother." The defendant's right and obligation to defend his mother is the same as his right of self-defense. Code, § 26-1015.

I concur in the opinion of the majority as to all the special assignments of error contained in the amended motion for new trial, but it is my firm conviction that the verdict and judgment are decidedly and strongly against the weight of the evidence, and that the trial court erred in overruling the motion for new trial on that general ground. "When the verdict of the jury is strongly

and decidedly against the weight of evidence in a criminal case the court will order a new trial. . . It is justifiable homicide to kill one who intends, by violence, to commit a felony upon the person of another. . . When the circumstances are such as to excite the fears of a reasonable man, in the absence of all other proof to the contrary, the law will attribute the killing to these fears, and not to revenge or passion."*Aaron* v. *State,* 31 *Ga.* 167.

No presumption of criminal homicide arises, where the accused admits the homicide but states circumstances of justification, and the testimony of witnesses which proves the homicide, also discloses circumstances of justification. *Green* v. *State,* 124 *Ga.* 343 (52 S. E. 431).