1. As to the general grounds, the evidence supports the verdict.
2. Where one is on trial for murder and the evidence involves mutual combat, and the verdict is for voluntary manslaughter, such a verdict is an acquittal of murder, and the failure to charge the principle of mutual combat under the Code, § 26-1014, is not cause for reversal. Had the verdict been for murder, the failure so to charge would be reversible error.
3. In a criminal case, where the conviction is based on evidence other than the confession of the defendant alone, it is not error, in the absence of a timely written request, to fail to charge the principles of law applicable to confessions. The same principles apply to incriminating admissions.
4. It is not error to fail to charge, in the absence of a written request, the principle of the Code § 26-1017, where, as here, the general charge covered the law of justification, reasonable doubt, presumption of innocence, and former verdict of acquittal.
5. "Where one uses a weapon deadly per se, in the usual and natural manner in which such weapon is used to kill, and death results, the law presumes an intention to kill."
 DECIDED FEBRUARY 3, 1948.
The defendant was indicted for murder and convicted of voluntary manslaughter. He filed an amended motion for a new trial, which was overruled, and on this judgment error is assigned.
Briefly, and we think substantially, the evidence reveals that Tom Davis, the defendant, and his brother, Babe Davis, and Jim Neel, the latter of whom we shall call the deceased, attended an all-night party. This party consisted of a considerable number of negroes, both men and women. They spent the night at the party, some of them engaging in gaming and others in drinking. The homicide occurred the following Sunday morning about 7 o'clock. A short time prior to the homicide, the record discloses that the defendant pulled a woman with whom the deceased was infatuated into his lap. Apparently the deceased became somewhat angered and pretty soon thereafter made some disparaging remarks concerning the defendant. While the woman was sitting on the lap of the defendant, the defendant passed a pistol to the hostess to keep for him. The hostess stated that she was afraid to keep it. During the time shortly before the homicide, the deceased procured a fire poker. The evidence shows that the poker was a chinaberry limb about two feet long, and light. It was introduced in evidence for consideration by the court and jury. There was no further description of it. There was a fire in the backyard and a considerable crowd was around this fire and a considerable number in the house. Soon after what we have above related took place, the defendant went out of the front door of the house, turned towards the backyard, his brother Babe went out the front door behind him, followed him out of the front door and around to the back, on the other side. The deceased followed behind Babe. As to just what happened immediately prior to the shooting after the defendant, his brother, and the deceased got on the outside of the house, the evidence is somewhat conflicting. Babe (the brother of the defendant) and the deceased were dressed somewhat alike. It is undisputed, however, that as Babe, the brother of the defendant, who was preceding the deceased around the house, came around the corner of the house, the defendant shot a bullet through his own brother's hat. As to this incident, one witness testified, "I saw Tom shoot Babe's hat off. Babe was not doing anything to Tom. . . Babe said, `Look out there [speaking to his *Page 429 
brother, the defendant], you done shot me.' He said `Look out there, man, you done shot a hole through my hat.' Then it was that Babe said to his brother Tom, "There comes the negro that wants to be the bad s.o.b.' Jim [meaning the deceased] was coming up beside the house, coming on the same side that Tom and Babe was on. I didn't see nothing [anything] in Jim's hands. When Babe said that, Tom [the defendant] pulled up on Jim and shot him. He fell under the edge of the house, and Tom walked out that way and shot two more times. He walked toward him [Jim] around the tree and walked to Jim and caught him by the leg and tried to pull him out from under the house, and he couldn't pull him out, and so Babe and them said `Come on, man, let's go,' and Tom and Babe and Mr. Orange then went on down the road. . . Jim laid there and he told us to put him in the house, so we put him on the porch." Afterwards the deceased was put in the house by the fire. He lived about an hour after the shooting. The witness further testified that "nobody had shot Jim but Tom Davis."
Another witness who was around the fire testified in part: "Tom shot Babe in the hat first. Babe was not doing anything to Tom when he shot him. . . When Babe picked up the hat he said: `You shot me. There's that bad s.o.b. there.' Jim Neel was on the north side of the house. He was on the same side of the house that Babe and Tom had come around. When Babe pointed to Jim and said, `There is the bad s.o.b.,' Tom just shot him. Jim was not doing anything to Tom. Jim was about six steps from Tom. Jim was about six steps from the house when he was shot. When he fell he crawled under the house. He wasn't far from the house. Tom grabbed Jim by his feet and went to pulling on him. I reckon trying to pull him out, but he didn't. Tom shot twice more. He shot after he grabbed hold of him."
Babe Davis, the brother of the defendant, testified on behalf of the defendant in part as follows: "I knew that Tom had a pistol, and I was looking for him to take him home. . . I didn't go the same way that he did because I wanted to cut him off. When I saw him [meaning the defendant], he was right around the corner of the house. I was standing on the porch, and when I saw him he was going on around the house. I was going to *Page 430 
carry him home. I didn't want to be in that argument. No sir, we were not looking for Jim Neel. Tom was in the back of the house, right at the corner of the house, the right corner. I went around to the right and he was there at the corner. Just as I got around to the corner, in the back, was when my hat was shot off. I had on a jacket like Jim Neel. Both of us had on a lumber jacket. I wasn't going to hurt my brother or anybody. I wasn't mad at anybody. I didn't have a pistol or shotgun or a rifle or a brick or anything to shoot with. I didn't say nothing to Tom before he shot my hat off. I was not trying to hurt Tom. I could not say how far he was from me. He was coming — he had come near about to the corner. I couldn't tell about exactly how far he was, but he had come to the left and I went to the right, and as quick as I got to the corner of the right-hand side was when he shot my hat off. I didn't know when he was going to shoot. He ran up there and snatched off my hat. This is the hat. I told him [meaning Tom, his brother, the defendant] to look out and not to shoot me, and then he snatched my hat off and looked at it. He went to the corner and looked and saw Jim Neel. After I looked up I saw him. I was on the right-hand side of the house. Tom was on the same side as me. I couldn't tell just how far he was. Tom went to the left and Jim to the right, which was the same way I went. He was coming up behind me. I did not know that Jim was behind me. When Jim fell he went up under the house. . . He fell at the corner of the house. After he [meaning the defendant] shot me [meaning the defendant's brother, Babe Davis], he shot Jim Neel. He shot twice. I could not tell how far Jim and Tom were apart. Jim was pretty close to me. . . Jim Neel came up back of me at once. He didn't quite get to the corner of the house. Tom told him to get back. Tom was standing still, but he looked down the side of the house and saw Jim coming, and as Tom saw Jim coming he just started back up and told him to get back, and fired twice."
There was evidence to the effect that the deceased had the fire poker above described, and was approaching the defendant, and the defendant was backing from the deceased just before the shooting of Jim Neel.
The evidence of the other witnesses for the State and the defendant, *Page 431 
we might say, is grouped in two divisions: on the one side, that the deceased was doing nothing to the defendant at the time the defendant shot him; and on the other, that the deceased was advancing towards the defendant with the poker in disobedience of the warning by the defendant to the deceased to stop. We will discuss such other portions of the evidence as becomes necessary in writing the opinion.
1. We will deal with the general grounds first. Able and diligent counsel for the defendant makes this statement in his brief: "Upon the trial, the evidence offered by the State was probably sufficient to support the verdict of manslaughter, but, according to the statement of the defendant and his witnesses, he made out a case of justifiable homicide." Conceding this statement to be well founded under the whole record the jury did not see fit to accept the statement of the defendant and his witnesses that the defendant was justified in the homicide. So that leaves the case, so far as the general grounds are concerned, for us to determine whether the evidence offered by the State is sufficient to support the verdict of voluntary manslaughter. After having carefully studied all of the evidence, and the surrounding circumstances as revealed by the record, we have little hesitancy in holding that the verdict is supported by the evidence. And unless we find some merit in one or more of the special grounds, the judgment should be affirmed.
2. Special ground 1 assigns error on the failure of the court to charge the law of mutual combat as applied to self-defense under the principles of law embraced in the Code, § 26-1014. This question has been presented to this court a number of times. Where one is on trial for murder and a verdict of voluntary manslaughter is returned, it is not reversible error for the court to fail to charge the principles of this section. In such an indictment a verdict of voluntary manslaughter is an acquittal of murder. The point would be good, provided mutual combat was involved under the evidence, if the verdict had been for murder. See Maddox v. State, 58 Ga. App. 450 (198 S.E. 799);Gresham v. State, 70 Ga. App. 80 (2) (27 S.E.2d 463);Hilliard v. State, 71 Ga. App. 528 (31 S.E.2d 246);Cribb v. State, *Page 432 71 Ga. App. 539 (2) (31 S.E.2d 248); Knight v. State, 73 Ga. App. 556
(37 S.E.2d 435). Counsel for the defendant cites numerous cases in support of his assignment of error on this ground. Practically all of them are discussed and dealt with in the cases cited above. It follows, therefore, that if we concede, without deciding, that mutual combat was involved under the evidence in the instant case, the failure to charge the principles of law applicable to mutual combat is not reversible error.
3. We will consider special grounds 2, 3, and 7 together, since they are so closely related and are based upon the subject-matter of a written statement which the defendant signed after the homicide in the presence of the sheriff and one of his deputies. This written statement was introduced in evidence by the State without objection on the part of the defendant. It is not contended by counsel for the defendant that this statement was a plenary confession. It is only contended that it was an incriminating admission. The court in its charge to the jury did not refer to the written statement at all. So far as the record shows, the term "confession" was never referred to during the progress of the trial. Special ground 2 is to this effect: That the court erred in failing to charge as follows: "If the defendant in this case admitted the killing of Jim Neel, the deceased, in the manner described in the bill of indictment, but in the same connection offered a legal or justifiable excuse for the killing of Neel, then I charge you that you would not have an admission of guilt, and you should not consider it as a confession." Special ground 3 complains because the court failed to charge the following: "If you believe any admissions were made by the defendant as to any fact or facts illustrative of his guilt or innocence you might consider this circumstance in connection with and in the light of any other facts, if there be any other facts established to you satisfaction, bearing upon the guilt or innocence of the accused, and from all of the testimony determine his guilt or innocence, but that all admissions should be scanned with care and received with great caution." Special ground 7 complains because the court failed to charge the following: "I charge you that in order to make the defendant's confession, if you find that he did confess, evidence against him, it must appear to your satisfaction that such confession was made voluntarily, without being induced by *Page 433 
another, by the slightest hope of benefit, or the remotest fear of injury." The gist of the statement of the defendant which he signed for the sheriff did admit the killing, but at the same time claimed self-defense in so doing. There was no request to charge on behalf of the defendant as to his contentions on either of these grounds. This court held in Kittle v. State, 54 Ga. App. 232
(2), (187 S.E. 611), as follows: "It is the general rule that in the trial of a criminal case the failure of the court to charge the law of confessions, in the absence of an appropriate and timely request, is not cause for the grant of a new trial; and while it is true that `there is a distinction between a case in which the conviction may depend upon a confession or upon other evidence, and a case in which conviction, if had, must depend upon the confession' (Rucker
v. State, 2 Ga. App. 140 (2), 58 S.E. 295), in which latter case the trial judge should, without request, charge on the law of confessions, yet in the present case the conviction was not one which, if obtained, must have depended alone on the confession of the defendant, but could have been sustained by other evidence introduced by the State. In the absence of a timely written request, the judge did not err in omitting to charge the jury on the law of confessions." Thus it is seen that where, as here, the conviction did not depend upon any confession, nor did the incriminating admission of the killing depend upon such admission for conviction but upon other ample evidence, such assignments of error are without merit. Surely, if under the facts of this case or any case the failure to charge on confession, where plenary, is not reversible error when the conviction is based on other evidence independent of such confession, the less reason for reversal would seem to apply to only an incriminating admission. We find no merit in these assignments of error.
4. Special ground 4 assigns error because the court failed to charge the provisions of the Code § 26-1017, as follows: "The homicide appearing to be justifiable, the person indicted shall, upon the trial, be fully acquitted and discharged." The court in its general charge instructed the jury as follows: "If you believe that the defendant shot and killed the person named in the indictment, but at the time of the killing the deceased was committing or attempting to commit a felonious assault upon *Page 434 
the person of the defendant, or the circumstances were such as to excite the fears of a reasonable person that the deceased was attempting, endeavoring, or about to commit a felonious assault upon the person of the defendant, and that the defendant shot and killed the deceased under those circumstances and not in a spirit of revenge, then and in that event, the defendant would be justified, and the form of your verdict would be, `We, the jury, find the defendant not guilty.'" Then the court further charged: "If you are not satisfied of his guilt of either murder or voluntary manslaughter, or if you have a reasonable doubt as to his guilt of either, or if you believe him justified, then you should acquit him, and the form of your verdict would be . ." A comparatively recent case of our Supreme Court is to the effect that, in the absence of a written request, the failure to charge this section, where the principles therein contained are covered by the general charge, is not reversible error. Tiller v.State, 196 Ga. 508 (7) (26 S.E.2d 883). For numerous other decisions to the same effect see citations under Code (Ann.) § 26-1017. The charge of the court was sufficient, in the absence of a written request for more amplified instructions. For a reversal under this assignment, the defendant relies on Waller
v. State, 102 Ga. 684 (28 S.E. 284). The reversal of the case on the failure to charge in that case was based on a different footing than the charge or the failure to charge in the instant case. There is no reversible error on this ground.
5. Error is assigned in special ground 5 on the failure of the court to charge the law applicable to involuntary manslaughter in the commission of an unlawful act, as embraced in Code § 26-1009. This court in Randolph v. State, 75 Ga. App. 253
(43 S.E.2d, 101), held: "Where one uses a weapon deadly per se in the usual and natural manner in which such weapon is used to kill, and death results, the law presumes an intention to kill." Of course it is elementary that involuntary manslaughter is the killing without the intention to do so. Counsel for the defendant in support of his contention cites Lyman v. State, 89 Ga. 337
(15 S.E. 467). The weapon there used was an empty glass pitcher and only one blow was struck. Counsel also cites Kelly
v. State, 145 Ga. 210 (88 S.E. 822). The weapon there used was a limb. In Dorsey v. State, 126 Ga. 633 *Page 435 
(55 S.E. 479), the weapon used was a part of a billiard cue. The weapon used in the case of Joiner v. State, 129 Ga. 295
(58 S.E. 859), was "one which would not ordinarily produce death." The weapon used in Anderson v. State, 130 Ga. 364
(60 S.E. 863), was the root of a tree, the exact size of which was not given. Finally, our attention is called to the case of Jackson
v. State, 43 Ga. App. 468 (159 S.E. 293), where this court said: "Where there is evidence sufficient to raise a doubt, however slight, upon the question whether the homicide was murder or manslaughter, voluntary or involuntary, it is the duty of the court to charge on all these grades of homicide. Applying the foregoing rule to the evidence in the case at bar, the trial judge erred in failing to charge the law of involuntary manslaughter, and for this reason alone the judgment is reversed." That ruling is beyond question the law of this State. The death in that case was caused by a gunshot wound. But there was some evidence to the effect that at the time the shot was fired a scuffle over the gun was in progress. It was, according to this phase of the evidence, at the time of the homicide not being used in the usual and ordinary manner in which such a weapon deadly per se, is used to kill. This special assignment is not meritorious.
6. Special ground 6 assigns error because the court submitted to the jury the question of voluntary manslaughter. It is contended in this ground that the evidence demanded a finding either for murder or justification. We have dealt with this question in the first division of this opinion, to the effect that the evidence was sufficient to support the verdict of voluntary manslaughter on the ground of irresistible passion aroused previously. This being so, this ground is without merit.
The court did not err in overruling the motion for a new trial for any of the reasons assigned.
Judgment affirmed. MacIntyre, P. J., and Townsend, J.,concur.